## Case No. 14,571.

### UNITED STATES v. BENNETT.

[16 Blatchf. 338 8 Reporter, 38; 12 Myer's Fed. Dec. 692; 25 Int. Rev. Rec. 305.] [1]

Circuit Court. S. D. New York. May 31, 1879.

CRIMINAL PRACTICE — OFFENCE AGAINST POSTAL REGULATIONS—OBSCENE PUBLICATION—INDICTMENT—HOW SET OUT—TRIAL—VERDICT.

1. There is no provision of law whereby an indictment found in a circuit court can be remitted by it to the district court, unless the district attorney deems it necessary.

2. The provisions of section 3893 of the Revised Statutes, as amended by section 1 of the act of July 12, 1876 (19 Stat. 90), which forbids the depositing in the mail, of any obscene or indecent publication, are not repugnant to any provision of the constitution of the United States.

3. It is not necessary that an indictment under that statute, in respect to a book, should set forth in hæc verba the alleged obscene book, or the alleged obscene passages in it, if the indictment states that such book is so indecent, that it would be offensive to the court and improper to be placed on its records, and that, therefore the jurors do not set forth the same in the indictment, and if the book is sufficiently identified in the indictment for the defendant to know what book is intended.

[Cited in U. S. v. Noelke. 1 Fed. 433.]

4. The defendant can always procure information of the charge which he is to meet, so far as

regards being furnished with a copy of the publication, or with a copy of the alleged obscene parts of it, by applying to the court, before the trial, for particulars.

5. The question whether, on the matter alleged to be obscene, a verdict that it is obscene would be set aside, as clearly against evidence and reason, can be fully raised before the trial, by a motion to be made on the indictment and a bill of particulars; and, under all other circumstances, it is for the jury to say whether the matter is obscene or not

6. A pamphlet of 24 pages, consisting of a sheet and a half secured together by stitching, and with a cover of four pages, and having a title page, is properly described as a book, in an indictment under said statute.

7. Whether a count in respect to a publication merely, without averring what kind of publication, is bad for uncertainty, quere.

8. It is sufficient if the indictment alleges that the defendant knowingly deposited the obscene book, without alleging that he knew it to be non-mailable matter under the statute.

9. It was proper to exclude, on the trial, a question put to the defendant, as a witness, as to whether, at any time, in the sale or mailing of the book, he did it with a knowledge or belief that it was obscene.

10. The district attorney having, at the trial, marked the particular portions of the book which he claimed to be within the statute, and having stated that he did not rely on any others, the court properly refused to permit the counsel for the defendant to read to the jury any portions of the book except the parts so marked, unless they were in immediate connection, to qualify the parts so marked. The marked parts and the contexts of the same were read to the jury and commented on by the defendant's counsel in his summing up, and each one of the jurors had a copy of the book in his hand during the reading and took the same with him.

11. The court properly refused to permit the defendant's counsel to read from other books clauses of alleged similar character, by way of illustration.

12. The court properly charged the jury, that the test of obscenity, within the meaning of said statute, is, whether the tendency of the matter is to deprave and corrupt the morals of those whose minds are open to such influences, and into whose hands a publication of the sort may fall.

[Cited in U. S. v. Britton, 17 Fed. 733. Approved in U. S. v. Wightman, 29 Fed. 636. Cited in U. S. v. Clarke, 38 Fed. 733; U. S. v. Harmon, 45 Fed. 417; U. S. v. Smith, Id. 477; U. S. v. Males, 51 Fed. 42.]

13. The object of the use of the obscene words is not a subject for consideration.

14. The statute differs from no other criminal statute, so as to require a different rule as to a reasonable doubt, on the evidence.

15. During the absence of the jury, the court sent to them by the officer in charge, and in the absence of the prisoner, after exhibiting the same to the counsel for the prisoner, a direction in writing that they might deliver a sealed verdict to said officer and then separate. They delivered a sealed verdict to said officer, and then separated. The next day they came into court, and announced, by their foreman, that they had agreed on a verdict, and that he had handed a sealed verdict to said officer. The jury then rendered a verdict of guilty, as stated in such sealed verdict, which was received by the court from said officer, in the presence of the defendant, and which was thereupon announced, and recorded, in open court, as a verdict of guilty. The jury were then polled, at the request of the defendant, and each of the jurors answered, that the verdict announced was his verdict. The offence was, by the statute, declared to be a misde-

meanor: *Held*, that no ground was shown for granting a new trial.

[This was an indictment against Deboigne M. Bennett.]

William P. Fiero, Asst. Dist. Atty.
Abram Wakeman, for defendant.

Before BLATCHFORD, Circuit Judge, and BENEDICT and CHOATE, District Judges.

BLATCHFORD, Circuit Judge. The indictment against the defendant contains two counts. The first count avers, that the defendant, "on the twelfth day of November, in the year of our Lord one thousand eight hundred and seventy-eight, at the Southern district of New York, and within the jurisdiction of this court, did unlawfully and knowingly deposit, and cause to be deposited, in the mail of the United States, then and there, for mailing and delivery, a certain obscene, lewd and lascivious book, called 'Cupid's Yokes, or The Binding Forces of Conjugal Life,' which said book is so lewd, obscene and lascivious, that the same would be offensive to the court here, and improper to be placed upon the records thereof; wherefore, the jurors aforesaid do not set forth the same in this indictment; which said book was then and there inclosed in a paper wrapper, which said wrapper was then and there addressed and directed as follows: G. Brackett, Box 202, Granville, N. Y." The second count avers, that the defendant, "on the twelfth day of November, in the year of our Lord one thousand eight hundred and seventy-eight, at the Southern district of New York, and within the jurisdiction of this court, unlawfully and knowingly did deposit, and cause to be deposited, in the mail of the United States, then and there, for mailing and delivery, a certain publication of an indecent character, called 'Cupid's Yokes, or The Binding Forces of Conjugal Life,' which said publication is so indecent that the same would be offensive to the court here, and improper to be placed on the records thereof; wherefore, the jurors aforesaid do not set forth the same in this indictment; which said publication was then and there inclosed in a wrapper, which said wrapper was then and there addressed and directed as follows, to wit: G. Brackett, Box 202, Granville, N. Y." The defendant was tried at one of the exclusively criminal terms of this court, held under the provisions of sections 613 and 658 of the Revised Statutes, by the district judge for the Eastern district of New York. The jury rendered a verdict of guilty, and the defendant has moved for a new trial, on a case and exceptions, and also to set aside the verdict, and for an arrest of judgment upon the same, the motion being made at an exclusively criminal term, held under the same sections, by the circuit judge for the Second judicial circuit, and the district judges for the Southern and Eastern districts of New York. [Case unreported.] Before the commencement of the trial, the counsel for the defendant moved the court, that the case be remitted from this court to the district court for this district, so that the defendant might be there tried, and thereby acquire a right to the benefit of the act of March 3, 1879 (20 Stat. 354), entitled "An act to give circuit courts appellate jurisdiction in certain criminal cases." The court denied the motion. The act of 1879 provides, that "the circuit court for each judicial district shall have jurisdiction of writs of error in all criminal cases tried before the district court, where the sentence is imprisonment, or fine and imprisonment, or where, if a fine only, the fine shall exceed the sum of three hundred dollars." It then provides for the settlement of a bill of exceptions, and for the allowance of a writ of error, and for the affirmance or reversal, by the circuit court, of the judgment of the district court, when it is a judgment against the defendant, in a criminal case. In this case, the sentence may be imprisonment or fine and imprisonment, or, if a fine only, the fine is to be not less than $100, nor more than $5,000. But, this indictment was found in this court before the act of 1879 was passed, and there is no provision of law whereby an indictment can be remitted by a circuit court to a district court, unless the district attorney deems it necessary. Such is the provision of section 1037 of the Revised Statutes. Section 1038 provides for the remission of an indictment from the district court to the circuit court, when, in the opinion of the district court, "difficult and important questions of law are involved in the case," but there is no provision under which a circuit court can, of its own motion, or on the application of the defendant, remit an indictment to a district court.

The case states as follows: "The prosecution then proved the deposit, by the defendant, in the United States mail, for mailing and delivery, of the work entitled 'Cupid's Yokes, or The Binding Forces of Conjugal Life.' The counsel for the prosecution then announced that he had marked the passages in the work already in evidence, in its entirety, which he would read to the jury, and with the reading of those passages to the jury he rested on the part of the prosecution." The counsel for the prisoner thereupon moved for the discharge of the prisoner, on the following grounds, to wit: "1. That the statute under which this indictment has been presented is not warranted by, and is in contravention of, the constitution of the United States, and is, therefore, without force and void. 2. That the indictment itself is defective, because it does not set out the whole pamphlet, nor localize in any way in it the matter alleged to be within the statute, nor the passages relied upon as obscene or of an indecent character, and which are now, for the first time, asserted as the grounds of this prosecution. 3. That the first count of the indictment is not sustained by the proof, for it avers the deposit of a book, whereas the

proof shows a deposit of a pamphlet. This, under the statute,. is a fatal variance. 4. The second count is also liable to a similar objection. It avers the deposit of 'a certain publication of an indecent character,' without further describing it, and the averment is not sustained by the evidence given. It is, therefore, void for uncertainty. 5. That the indictment does not allege an offence under the statute, in that it does not set forth that the said pamphlet is 'non-mailable' under said statute, and that it does not set out that the prisoner knew that the same 'was non-mailable, as is required by the statute, so as to constitute an offence thereunder." The court denied the motion.

The· statute under which this indictment proceeds is section 3893 of the Revised Statutes, as amended by section 1 of the act of July 12, 1876 (19 Stat. 90). It provides as follows: "Every obscene, lewd or lascivious book, pamphlet, picture, paper, writing, print, or other publication of an indecent character, * *·* are hereby declared to be non-mailable matter, and shall not be conveyed in the mails, nor delivered from any post office, nor by any letter carrier; and any person who shall knowingly deposit, or cause to be deposited, for mailing or delivery, anything declared by this section to be non-mailable matter * * * shall be deemed guilty of a misdemeanor, and shall, for each and every offence, be fined not less than one hundred dollars nor more than five thousand dollars, or imprisoned at hard labor not less than one year nor more than ten years, or both, at the discretion of the court." The question of the constitutionality of this statute, so far as the offences charged in this indictment are concerned, seems to us to have been definitely settled by the decision of the supreme court in Ex parte Jackson, 96 U. S. 727. That decision related to a statute excluding from the mail letters and circulars concerning lotteries, but the views of the court apply fully to the present case.

It is insisted that the book or publication alleged in the indictment to be obscene, lewd and lascivious or of an indecent character, should have been set forth in· hæc verba in the indictment, or that, at least, the passages in it relied upon as obscene or of an indecent character, should have been thus set forth. This is claimed, on the view, that the accused has a right to demand a precise statement, in the indictment, of all the facts constituting his alleged offence. The indictment proceeds on the ground, that, if it states that the obscene, lewd or lascivious book is so obscene, lewd and lascivious, or that the publication of an indecent character is so indecent, that the same would be offensive to the court and improper to be placed on the records thereof, and that, therefore, the jurors do not set forth the same in the indictment, it is not necessary to set forth in hæc verba the book or publication or the obscene or indecent parts of it relied on, provided the book

or publication is otherwise sufficiently identified in the indictment for the defendant to know what book or publication is intended.

It is the law of England, as decided in Bradlaugh v. Reg. 3 Q. B. Div. 607, by the court of appeal, that, in an indictment at common law, for publishing an obscene book, it is not sufficient to describe the book by its title only, but the words thereof alleged to be obscene must be set out, and, if they are omitted, the defect will not be cured by a verdict of guilty, and the indictment will be bad, either upon a motion in arrest of judgment, or upon a writ of error. This decision reversed, on a writ of error, that of the queen's bench division in Reg. v. Bradlaugh, 2 Q. B. Div. 569. The indictment in that case identified the book only by its title, and it neither set forth the book nor any part of it, and it did not allege any reason for not setting forth the same. The conclusion arrived at by the court of appeal was, that, whenever the offence consists of words written or spoken, those words must be stated in the indictment, and, if they are not, it will be defective upon demurrer, or on motion in arrest of judgment, or on writ of error. The court rejected the reason given for not setting forth on the record obscene libels, that the records of the court should not be defiled by the indecency, and it pointed out, that, in order to bring the indictment before it within the American cases cited to it, referred to hereafter, it would have been necessary to aver that the libel was so indecent and obscene that it ought not to appear on the records of the court.

In Com. v. Holmes, 17 Mass. 336, the indictment was for an offence at common law —publishing an obscene print, in a book, and also for publishing such book. The second count did not set forth the book or any part of it, but alleged that it was so · obscene that it would be offensive to the court and improper to be placed on the records thereof, and that, therefore, the jurors did not set it forth in the indictment. The fifth count described the print. The defendant, after conviction, moved in arrest of judgment, because, in certain counts, no part of the book was set forth, and because, in certain other counts, the print was not so particularly described as it ought to have been, so that the . jury might judge whether the same was obscene. The court said: "The second and fifth counts in this indictment are certainly good, for it can never be required that an obscene book and picture should be displayed upon the records of the court, which must be done if the description in these counts is insufficient. This would be to require that the public itself should give permanency and notoriety to indecency, in order to punish it."

In Com. v. Tarbox, 1 Cush. 66, the indictment was for a statutory offence—publishing and distributing a paper containing obscene language. The indictment set forth what it

alleged to be the purport and effect of the paper and gave no excuse for not setting it forth in hæc verba. The defendant, after conviction, moved in arrest of judgment, because the indictment did not profess to set out the words or tenor of the publication, but only its substance, and did not aver any reason or excuse for not setting out the words. The court say: "In indictments for offences of this description, it is not always necessary that the contents of the publication should be inserted: but, whenever it is necessary to do so, or whenever the indictment undertakes to state the contents, whether necessary or not, the same rule prevails as in the case of libel, that is to say, the alleged obscene publication must be set out in the very words of which it is composed, and the indictment must undertake or profess to do so, by the use of appropriate language. The excepted cases occur whenever a publication of this character is so obscene as to render it improper that it should appear on the record; and then the statement of the contents may be omitted altogether, and a description thereof substituted; but, in this case, a reason for the omission must appear in the indictment, by proper averments. The case of Com. v. Holmes, 17 Mass. 336, furnishes both an authority and a precedent for this form of pleading. In the present case, the indictment sets out the printed paper according to its purport and effect, and not in hæc verba, or according to its tenor, or by words importing an exact transcript. The mode of pleading adopted cannot be sustained, and, the indictment being insufficient, judgment is arrested."

In Com. v. Sharpless, 2 Serg. & R. 91, the indictment charged that the defendant "did exhibit and show for money to persons, to the inquest aforesaid unknown, a certain lewd, wicked, scandalous, infamous, and obscene painting, representing a man in an obscene, impudent and indecent posture with a woman." After a verdict against the defendant, a motion in arrest of judgment was made, on the ground that the picture was not sufficiently described in the indictment. On this point, Tilghman, C. J., says: "We do not know that the picture had any name, and, therefore, it might be impossible to designate it by name. What, then, is expected? Must the indictment describe minutely the attitude and posture of the figures? I am for paying some respect to the chastity of our records. These are circumstances which may be well omitted. Whether the picture was really indecent the jury might judge from the evidence, or, if necessary, from inspection. The witnesses could identify it. I am of opinion that the description is sufficient." The motion in arrest was overruled.

In People v. Girardin, 1 Mich. 91, the indictment charged that the defendant printed and published "a certain wicked, nasty, filthy, bawdy and obscene paper and libel, entitled City Argus, in which said libel are contained, among other things, divers wicked, false, feigned, impious, impure, bawdy and obscene matters, language and descriptions, wherein and whereby are represented the most gross scenes of lewdness and obscenity," &c. After conviction, the defendant moved in arrest of judgment, on the ground that the obscene matter was not set forth in the indictment. The motion was overruled. The court said: "There is another rule, as ancient as that contended for by the counsel for the prisoner, which forbids the introduction in an indictment of obscene pictures and books. Courts will never allow their records to be polluted by bawdy and obscene matters. To do this, would be to require a court of justice to perpetuate and give notoriety to an indecent publication, before its author could be visited for the great wrong he may have done to the public or to individuals. And there is no hardship in this rule. To convict the defendant, he must be shown to have published the libel. If he is the publisher, he must be presumed to have been advised of the contents of the libel, and fully prepared to justify it. The indictment in this cause corresponds with the precedents to be found in books of the highest merit. If authority were necessary, the case of Com. v. Holmes, 17 Mass. 336, fully sustains the views we have expressed."

In State v. Brown, 1 Williams [27 Vt.] 619, the indictment was for selling an obscene publication, which was described in the indictment as "a certain lewd, scandalous and obscene printed paper, entitled 'Amatory Letters,' 'Ellen's Letter to Maria,' and 'Maria's Letter to Ellen,' which said printed paper is so lewd and obscene that the same would be offensive to the court here, and improper to be placed upon the records thereof, wherefore, the jurors aforesaid do not set forth the same in this indictment." The defendant demurred to the indictment, but it was held sufficient. The court, (Redfield, C. J.,) say: "Ordinarily, the indictment, in a case like the present, should set forth the book or publication in hæc verba, the same as in indictments for libel or forgery. This seems to be an acknowledged principle in the books. But, even in indictments for forgery, it may be excused, as, if the forged instrument is in the possession of the opposite party. So, also, in a case like the present, if the publication be of so gross a character that spreading it upon the record will be an offence against decency, it may be excused, as all the English precedents show. Some of the precedents are much like the present, describing the obscene character of the publication in general terms. But, more generally, the nature of the publication is more specifically described. But, in both cases, the principle of the case is the same. If the paper is of a character to offend decency and outrage modesty, it need not be so

-spread upon the record as to produce that effect. And, if it is alleged. in such case, to be a publication within the general terms in which the offence is defined by the statute, it is sufficient, which seems to be done in the present case. The degree of particularity with which the paper could be described without exposing its grossness, would depend something upon the nature of that feature, whether it consisted in the words used or the general description given. In the former case, it could not be more particularly described than it here is, without offending decency."

In McNair v. People [89 Ill. 441], the view of the court was, that, if the obscene publication is in the hands of the defendant, or is not in the power of the prosecution, or the matter is too gross and obscene to be spread on the records of the court, and the excuse for the failure to set out the obscene matter is averred in the indictment, the supposed obscene matter need not be set out in the indictment.

One Heywood was indicted in the district court of the United States for the district of Massachusetts. The indictment contained two counts. The first count alleged that the defendant "did unlawfully and knowingly deposit, and cause to be deposited, in the mail of the United States of America, then and there, for mailing and delivery, a certain obscene, lewd and lascivious book, called 'Cupid's Yokes, or The Binding Forces of Conjugal Life,' which said book is so lewd, obscene and lascivious that the same would be offensive to the court here and improper to be placed upon the records thereof, wherefore, the jurors aforesaid do not set forth the same in this indictment, which said book was then and there enclosed in a wrapper and addressed as follows, that is to say: 'E. Edgewell, Squan Village, New Jersey, Box 49.'" The second count alleged that the defendant "did wilfully and unlawfully deposit, and cause to be deposited, in the mail of the United States of America, then and there, for mailing and delivery, a certain publication of an indecent character, called 'Cupid's Yokes, or The Binding Forces of Conjugal Life,' which said publication is so indecent that the same would be offensive to the court here and improper to be placed upon the records thereof, wherefore, the jurors aforesaid do not set forth the same in this indictment, which said publication was then and there enclosed in a paper wrapper and addressed as follows, that is to say: 'E. Edgewell, Box 49, Squan Village, New Jersey.'" The indictment was remitted to the circuit court, and the defendant was tried on it before Judge Clark, at the October term, 1877, and convicted. Afterwards he filed a motion in arrest of judgment, in January, 1878, before sentence. on the ground that the act of congress under which the indictment was found, to wit, section 3893 of the Revised Statutes, was unconstitutional,

inoperative and void. In June, 1878, he filed a motion for leave to amend said motion in arrest, by assigning the additional cause, that "the indictment does not set out the book alleged to be obscene, lewd and lascivious and indecent, and the same is not made a part of said indictment." Both motions were heard before Mr. Justice Clifford and Judge Clark and were overruled, and the defendant was sentenced to pay a fine and be imprisoned.

No case in the United States has been cited where an indictment in form like the one in this case, for publishing or circulating or mailing an obscene or indecent publication, has been held defective, either on demurrer or on motion in arrest of judgment. In Knowles v. State, 3 Day, 103, the information alleged that the defendant exhibited a horrid and unnatural monster, highly indecent, unseemly, and improper to be seen or exposed, as a show. It stated no circumstances describing the appearance of the thing, and gave no excuse for omitting such description. It was held bad, on a motion in arrest of judgment. In State v. Hanson, 23 Tex. 232, the indictment alleged that the defendant "did publish an indecent and obscene newspaper called 'John Donkey,' manifestly designed to corrupt the morals of the youth of said county." The composition or print was not set out or described, nor was any excuse given in the indictment for failing to do so. The indictment was held bad, on exception. In People v. Hallenbeck, 52 How. Prac. 502, the indictment alleged that the defendant did utter, write and publish a certain obscene, lewd and indecent paper and writing, which said paper was enclosed in an envelope and deposited in the post office of the United States at said town of Catskill, for mailing and delivery, the said envelope being then and there addressed by the words following, that is to say: "Mrs. Mary T. Westmore, Catskill, N. Y." The indictment was demurred to. The court held, that, as there was no description whatever of the alleged libellous writing, not even by its title. and not the slightest thing was mentioned by date, subject matter, expression, thought or word, which identified or described the alleged obscene writing, the indictment was bad.

For the rule that an indictment must state the facts which constitute the crime, three reasons have been assigned by the authorities: (1) That the person indicted may know what charge he has to meet; (2) that, if convicted or acquitted, he may with facility plead or prove a plea of autrefois convict or autrefois acquit; (3) that he may take the opinion of the court before which he is indicted, by demurrer, or by motion in arrest of judgment, or the opinion of a court of error by writ of error, on the sufficiency of the statements in the indictment. As to the first two reasons, Lord Justice Bramwell says, in Bradlaugh v. Reg., 3 Q. B. Div. 616, that

"those two reasons may be disregarded, because an accused person is very rarely ignorant of the charge which he is called upon to meet, and no real difficulty exists as to pleading or proving a former conviction or acquittal," adding, however, that it was a very plausible observation, that, where the book as a whole is charged as an offence, the defendant cannot tell what passages will be selected as those on which the charge is to be supported. As to the third reason, the lord justice says, that, in his opinion, it is to this day substantial and cannot be disregarded.

As to being informed of the charge which he has to meet, so far as regards being furnished with a copy of the book or with a copy of the alleged obscene parts of it, a defendant can always procure such information by applying to the court, before the trial, for particulars. In the present case, there is no complaint that such application was made and refused, and the case shows that, at the trial, immediately after the mailing of the book was proved, the counsel for the prosecution announced that he had marked the passages in the book which he would read to the jury, and then read them to the jury. The defendant made no claim that he was not until then advised what such passages were, or that he was prejudiced by not being until then so advised, nor did he move to delay the trial because not sooner advised of them; and the court afforded time for the examination of such marked passages and their contexts, by adjourning until the next day, before the counsel for the defendant commenced his summing up to the jury.

We are unable to recognize the force of the suggestion, that the defendant, in the case of an indictment for depositing an obscene book in the mail, is entitled to take the opinion of the court by demurrer, as to whether the matter alleged to be obscene is obscene. The suggestion referred to has never been regarded, in the American cases, as of sufficient weight to lead to a following of the present English rule. The true view, we think, is, that if, in a case like the present one, any question can be raised to the court, it can only be the question whether, on the matter alleged to be obscene, a verdict that it is obscene would be set aside as clearly against evidence and reason. This question can be fully raised before the trial, by a motion to be made on the indictment and a bill of particulars. Under all other circumstances, it is for the jury to say whether the matter is obscene or not. See Com. v. Landis, 8 Phila. 453.

In the present indictment, the defendant had information given to him as to the offence charged, by the date of the mailing, by the title of the book, and by the address on the wrapper. The indictment states the reason for not setting forth the book to be, that it is too obscene and indecent to be set forth. A copy of the book, with a designation of

the obscene passages relied on, could have been obtained before the trial, by asking for a bill of particulars. The defendant was not deprived of the right "to be informed of the nature and cause of the accusation." The weight of authority, as well as of reasoning, is in favor of the sufficiency of the present indictment. See U. S. v. Foote [Case No. 15,-128].

It is objected, that the publication in question is not a "book," as alleged in the first count of the indictment, but is a pamphlet of 23 pages. It consists of one sheet of 16 pages and a half sheet of 8 pages, secured together, making 24 pages of white paper, with a cover of 4 pages of colored paper. It has a title page, which is page one of the white paper, and the title on such title page is printed identically on page one of the cover. Page 24 of the white paper and pages 3 and 4 of the cover are filled with advertisements. The case shows, that the defendant's counsel, on the trial, in his offers of evidence and in his questions to witnesses, called the publication in question a "book." He so called it in questions to the defendant as a witness. We think there is nothing in the objection.

It is also objected, that the second count does not state whether the publication is a book, a pamphlet, a picture, a paper, a writing, or a print, or what other publication than any one of those it is; and that it is bad for uncertainty. Whether the second count is good or not, the first count is good and sufficient to support the conviction.

It is also contended, that it is not sufficient for the indictment to allege that the defendant knowingly deposited the obscene book, but that it should aver that he knew the same to be non-mailable matter under the statute. We think the objection untenable. If the defendant knew what the book was which he was depositing, if he did not deposit it by mistake, or if he did not deposit it when he thought he was depositing another book, it is of no consequence that he may not have known or thought it to be obscene and so non-mailable, so long as it was, in fact, obscene, and he knew he was depositing the identical book complained of.

The defendant, as a witness at the trial, was asked, on direct examination: "Q. At any time, in the sale or mailing of this book, you may state whether you did it with a knowledge or belief that it was obscene?" On objection, the question was excluded. The propriety of such exclusion is manifest, as will appear from views to be presented hereafter, in connection with the charge and the defendant's requests to charge.

At the close of the testimony, the counsel for the defendant offered to read to the jury the whole book in question, and the district attorney objected to the reading of the whole book. The district attorney had marked the particular portions of the book which he claimed to be within the statute,

and stated that he did not claim that any portions of the book, except those which were marked, brought it within the scope of the statute. The court said: "I do not feel called upon to permit the reading of any portions of the book, except the parts marked, unless it be in immediate connection, to qualify that particular portion of the book. The general scope of the book is not in issue. I, therefore, shall confine the. counsel to those parts that the government has marked. If counsel on the part of the defence think proper to read them to the jury, I do not forbid that, and I allow any latitude of comment upon those portions; but, as to the rest of the book, in my opinion, there is no occasion for its being read. When .counsel reach that stage where it is proper to sum up the case, portions of it may be read then. The jury shall have . the whole book, but the necessity of reading the whole book is not apparent, and I am inclined to forbid it, and give you an exception. If there is any particular sentence necessary to make the sense and meaning of a passage clear, I intend to allow you to read that." To this ruling the defendant's counsel excepted. The case afterwards says: "The counsel then proceeded, under permission of the court, to read, and to comment to the jury upon, each of the passages marked, as relied upon by the prosecution, and the context of the same. The passages relied upon by the prosecution, and read and commented on by the prisoner's counsel, are marked and numbered with black ink, in the Exhibit 'Cupid's Yokes' herewith submitted to the court, and the contents of the same, read by the prisoner's counsel, are indicated by red ink. and are at pages 1, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and each one of the jurymen had a copy of the book in his hand during the reading, and took the same with him." The case elsewhere states, that the court allowed the counsel for the defendant to read and comment on the contexts of the passages marked by the prosecution, so far as to show the meaning of the language of the marked passages. So far as the case shows, the counsel for the defendant was, under this ruling, left entirely free to select and read everything which he thought would show the meaning of' the language of the marked passages, except that, after reading the last passage marked by the prosecution, marked 22, he offered to read to the jury the last page of the book, page 23, and, on objection. the court refused to permit it to be read, and the defendant excepted. It is entirely clear, that the page so excluded contained nothing which shows the meaning of the language of any passage marked by the prosecution. We do not perceive that the defendant was deprived of any right or privilege to which he was entitled. The jurors had each of them a copy of the whole book, and the parts which the defendant's

counsel was excluded from reading and commenting on, were parts which, under the law applicable to this case, may properly be regarded as not being in the book.

In commenting on one of the passages which he read, the counsel for the defendant stated that he desired to read from another book, a clause of a similar character, by way of showing "how that sort of illustration. or expression or narrative is regarded in standard literature." The court excluded all reference to, and illustrations from, other books and publications, and the defendant's counsel excepted. We are unable to see that there was any error in their exclusion. It is the duty of the court to prevent the presentation to the jury of any issues other than the one on trial, and it did not tend to show that the marked passage in question was not obscene, that another passage in the book from which the marked passage was quoted, or another passage in some other book, was not generally accepted as obscene. ·

The foregoing are all the matters occurring prior to the requests to charge, in respect to which error is alleged, in the argument of the defendant's counsel.

Prior to the charge to the jury, the following requests to charge were made by the defendant and were refused by the courts, except as they agree with its charge and rulings as made: "(1) That, by the word 'obscene' is meant, 'that which openly wounds the sense of decency,' by exciting lust or disgust. That, by 'indecent' is meant, the wanton and unnecessary expression or exposure, in words or pictures, of that which the common sense of decency requires should be kept .private or concealed. That, where words which might otherwise be obscene or indecent, are used in good faith, in social polemics, philosophical writings, serious arguments, or for any scientific purpose, and are not thrust forward wantonly, or for the purpose of exciting lust or disgust, they are justified by the object of their use, and are not obscene or indecent, within the meaning and purpose of the law. (2) That none of the words used in .the parts of the essay in question relied upon by the prosecution are, by and of themselves, necessarily obscene or indecent; that all of said words are well known and common words of the English language, and may be properly used as such, and are not within the meaning and purpose of the law, unless wantonly and unnecessarily used, so as to offend the sense of decency. (3) That the true character of these words, and whether they are obscene or not, must be determined by their context, and by the scope and purpose of the whole essay, and by the jury. That any of the words objected to, which may at first .seem to be unnecessarily used, are not within the law. if reasonably required by the argument and the context, and if they were plainly so used by the author.

(4) That, because some of the words and sentences used may be, from certain points of view, or generally, immodest, indelicate, impolite, unbecoming, blasphemous, irreligious, immoral, and bad in their influence upon society, such words and sentences are not, therefore, necessarily obscene, and do not make the essay obscene, within the intent of the law, nor under this indictment. (5) That the whole scope of the essay and the purposes and intent of the author must be considered, before it is found that the words and sentences claimed to be objectionable bring it within the meaning and purpose of the law. That, if the general intent and purpose of the essay was not to make an obscene or indecent publication, the passages relied upon by the prosecution do not necessarily make it so. (6) That the fact, that the words and sentences claimed to be obscene, or similar ones, are, and have been for years, in common use in scientific, polemic, or controversial writings, and in reformatory and general literature, is to be considered by the jury, in determining whether they are used in this essay so as to be really an offence under the law or not, and that such use affords a strong presumption that they are not within the law. (7) That, when the words and sentences claimed to be obscene are used in a social polemic, the necessity and propriety of their use in a work of that character should be considered by the jury, and, if they appear to have been used by the author in good faith, for the purposes of the polemic, and not wantonly, for the purpose to offend decency or to excite lust or disgust, they do not constitute an offence under the statute. (8) That, although it may appear certain to the jury, that the doctrines and sentiments of the passages relied upon by the prosecution, or of the whole essay, would be injurious to the community, or destructive to society, if generally practiced, yet, if said words and sentences were used by the author in good faith, to properly and reasonably set forth his mistaken and wicked doctrines and sentiments, and not wantonly or unnecessarily, to offend decency or to excite lust or disgust, such words and sentences are not within the law. In no case should the jury be influenced by the effect which, in their judgment, those mistaken and wicked doctrines and sentiments might have upon morals, or society, or the family, or religion, or the welfare of the community, if brought into general practice. (9) That, this statute, being in derogation of the common law, and restrictive of the liberties of the citizen, and of a highly penal character, should be strictly construed, in cases of this kind. (10) That, when, in cases under this law, doubts and uncertainties arise as to the meaning and intentions of the words objected to, or in construing them with the context, or if there are difficulties in applying the definitions given by the court. all reasonable doubts, uncertainties and difficulties are to be resolved by giving the accused the benefit of them."

The court then charged the jury as follows: "The statute under which the defendant is indicted provides, that 'every obscene, lewd, or lascivious book or pamphlet, picture, paper, writing, print, or other publication of an indecent character' is nonmailable matter, and shall not be conveyed in the mails, nor delivered from any post office, nor by any letter-carrier; and that any person who shall knowingly deposit, or cause to be deposited, for mailing or delivery, anything so declared to be non-mailable matter, shall be guilty of an offence, and liable to the punishment stated. The object of this statute was to prevent the employment of the mails of the United States for the purpose of disseminating obscene literature. The necessity of such a statute is obvious to any person who has paid attention to the facts. If you think what the United States mails are, how they are protected by the law, where they go, the secrecy attending their operations, you will at once see, that, for the distribution of matter of any kind upon paper, there is no other engine of equal power. It is the machine best adapted to the dissemination of obscene literature, because of the fact that it reaches every person, and letters delivered by the mail can be received in secret by the person to whom they are addressed, whether in their own or in fictitious names. For this reason the mails have been used, and the extent to which they have been used for that purpose is appalling to one acquainted with the facts. These facts have been made known to the congress of the United States, the government of the United States alone being charged with the carrying of the mails. and it being competent for the congress of the United States to say what shall be and what shall not be carried in the mails, whereupon congress declared that obscene matter should not be so carried. Nobody can question the justice, the wisdom, the necessity of such a statute. This statute does not undertake to regulate the publication of matter. Matter of any kind may be published, and not violate this law. It does not undertake to regulate the dissemination of obscene matter. Such matter may be sent by express, without violating any law of the United States. But, what the United States government says is, that the mails of the United States shall not be devoted to this purpose. It is a law to protect the community against the abuse of that powerful engine, the United States mail. The constitutionality of the law is not a question here. The statute is the law of the land, and it is to be enforced by the courts, to be obeyed by the citizens. Under this statute, this defendant is charged with having deposited in the mail an obscene book or publication. There has

been some talk about who made the complaint. But, who made the complaint which caused this prosecution to be instituted is a matter of no consequence to you or to me. The motives of the person who made the complaint are not material here. Most infractions of law are discovered and punished by reason of hostility or enmity on the part of some person in the community against some other person. But that does not affect the question of the guilt or innocence of the party accused, when he is properly accused under the law. So, you will dismiss from your consideration the question whether Mr. Comstock has hostile feelings against this man or not. It makes no difference whether he has or has not. The prosecution is not his. It is the prosecution of the United States. Under our form of criminal procedure, a prosecution must be endorsed by the district attorney, an officer selected under the law, as a public prosecutor. There is not such an officer in all countries. In England, I think, to this day, there is no public prosecutor, which accounts, perhaps, for the happening of such an event as was alluded to by the counsel, in the case of Shelley's works. But here there is a public prosecutor, and he must entertain the complaint and present it to the grand jury. The grand jury, under their oaths, must find it a case proper to be presented to a petit jury; and that has been done in this case. Whether it is wise to institute such prosecutions or not, is not a question for you or for me. You are not the district attorney; you have not the responsibility of the district attorney upon you; and it is not likely that you will be willing to assume that responsibility, by deciding any case like this upon the question whether the effect of such a prosecution will be good or ill. Your duty in this case, under your oaths, can only be discharged by rendering a verdict according to the facts proven. The facts belong to you; the questions of law belong to the court. You will not undertake, therefore, to speculate upon the construction of the law, but leave that responsibility upon the court, where it belongs. You will consider the facts, for, your responsibility is a responsibility in regard to the facts of the case. I do not intend, in my remarks, to convey to you my opinion of the questions of fact involved. I intend to leave you, upon your oaths and your responsibility, to say what are the facts here, and to render the verdict which the facts may require. This is not a question of religion, nor a question of the freedom of the press. There is no such question involved in this prosecution. This defendant may entertain peculiar views on the subject of religion; he may be an infidel; he may have peculiar and improper notions on the marriage relation; he may be a freethinker; he may be whatever he pleases; that should have no effect upon your deliberations. Whatever may be his beliefs or opinions, he is entitled here to a verdict at your hands, impartially, upon the simple fact involved in this case, and upon no other fact. If you should find a verdict against this man because you do not like his doctrines in respect to religion, if you should find a verdict against him because you do not like attacks on the marriage relation, you would do injustice to the man, and to the community also, for the community has no other interest than to have criminal cases decided correctly according to the law, and impartially upon the facts. But, if you should find that this book is an obscene book, he having deposited it, and you nevertheless acquit him because of any opinion you may have in harmony with his doctrines or beliefs, you would be equally guilty of an injustice. You are not, therefore, called upon by your verdict to express your opinion in regard to any doctrines alluded to in this publication. All men in this country, so far as this statute is concerned, have a right to their opinions. They may publish them; this man may entertain the opinions expressed in this book, or he may not. Freelovers and freethinkers have a right to their views, and they may express them, and they may publish them; but they cannot publish them in connection with obscene matter, and then send that matter through the mails. If, in the discussion of any doctrine, any man uses obscene matter, he cannot send it through the mails of the United States, without violating the law. Of course, freedom of the press, which, I think, was alluded to, has nothing to do with this case. Freedom of the press does not include freedom to use the mails for the purpose of distributing obscene literature, and no right or privilege of the press is infringed by the exclusion of obscene literature from the mails. That this man mailed this book is proved, and not controverted; that he knew what the book was that he mailed is not controverted. The statute has the word 'knowingly.' That means that the man must know what book he deposited. A boy might be sent with an obscene book wrapped in a paper, and he might deposit it in the mail, and he would not be guilty under this statute, for it says, 'knowingly;' but, when a man deposits in the mail a book, if he knows what the book is, then he has made a deposit knowingly, within the statute. You could have no question about that, it not being controverted that this man mailed this book, and that he knew what book he was mailing. The only question, therefore, which you are called upon to decide, is, whether or not the book is obscene, lewd or lascivious, or of an indecent character. Now, you have had this book in your hands, and the district attorney has marked certain passages. He does not claim that any passages in that bring it within the stat-

ute, except those marked, and, therefore, you may confine your attention to the marked passages, as the matter which you are to determine upon. It is upon those passages alone that this case must turn. There has been some discussion in this case, tending in the direction of the argument, that, if the general scope of the book was not obscene, the presence of obscene matter in it would not bring it within this statute. Such is not the law. If this book is, in any substantial part of it, obscene, lewd, lascivious, or of an indecent character, then it is non-mailable under this statute and the defendant is guilty. Any other rule of law would render the statute nugatory. If a person should write an essay upon the subject of honesty, and fill it with notes containing filthy and obscene stories, and could then pass it through the mails on the ground that it was an essay on honesty, the way would be easy to a disregard of the statute. So, I again charge you, that the general scope of this book is not the matter in hand. but the question is, whether those marked passages are obscene or indecent in character. There are, in the language, words known as words obscene in themselves. It is not necessary, in order to make a book obscene, that such words should be found in it. The most obscene. lewd, and lascivious matter may be conveyed by words which in themselves are not of an obscene character. The question is as to the idea which is conveyed in the words that are used, and that idea characterizes the language. As I have stated, the object with which this book is written is not material, nor is the motive which led the defendant to mail the book material. The effect likely to be produced by this matter which was in the book is the question for you. A man might—I mention this by way of illustration only—a man might conclude that it would be the best way to promote honesty and purity to bind together in a single book all the obscene stories that could be found—and we may imagine a person to honestly entertain the belief that that course would be the best way to excite disgust and so to prevent vice—he might honestly entertain that view and be as good a man as any man in the community. yet. if he published such a book and concluded to disseminate it through the mails, he would be a violator of this statute. The question is, whether this man mailed an obscene book; not why he mailed it. His motive may have been ever so pure; if the book he mailed was obscene, he is guilty. You see, then, that all you are called upon to determine in this case is, whether the marked passages in this book are obscene, lewd or of an indecent character. Now, I give you the test by which you are to determine the question. It is a test which has been often applied. and has passed the examination of many courts, and I repeat it here, as the

test to be used by you. You will apply this test to these marked passages, and if, judged by this test, you find any of them to be obscene, or of an indecent character, it will be your duty to find the prisoner guilty. If you do not find them, judged by this test, to be obscene, or of an indecent character. it will be your duty to acquit him. This is the test of obscenity, within the meaning of the statute: It is, whether the tendency of the matter is to deprave and corrupt the morals of those whose minds are open to such influences, and into whose hands a publication of this sort may fall. If you believe such to be the tendency of the matter in these marked passages, you must find the book obscene. If you find that such is not the tendency of the matter in these marked passages, you must find the book not obscene, and acquit the prisoner. The statute uses the word 'lewd,' which means, having a tendency to excite lustful thoughts. It also uses the word 'indecent.' Passages are indecent within the meaning of this act, when they tend to obscenity—that is to say, matter having that form of indecency which is calculated to promote the general corruption of morals. Now, gentlemen, I have given you the test; it is not a question whether it would corrupt the morals, tend to deprave your minds or the minds of every person; it is a question whether it tends to deprave the minds of those open to such influences and into whose hands a publication of this character might come. It is within the law if it would suggest impure and libidinous thoughts in the young and the inexperienced. There has been some comment on the fact, that, in many libraries you may find books which contain more objectionable .matter, it is said, than this book contains. It may be so; it is not material here. When such books are brought before you, you will be able to determine whether it is lawful to mail them or not. Here, the question is with reference to this book; and it is of no importance how many books of worse character this man, or that man, or the other man, has, or whether the tendency of those books is worse or better than this book. The question is, the tendency of this book. If you find that the tendency of the passages marked in this book is to deprave and corrupt the morals of those whose minds are open to such influences, and into whose hands a publication of this sort may fall, it is your duty to convict the defendant, notwithstanding the fact that there may be many worse books in every library of this city. Now, gentlemen, I have endeavored to bring you down, in your examination of this case, to the precise point. This is a question, as I have before stated, for you alone; the responsibility is upon you, and upon each of you. to say, upon your oaths. after an examination of those passages, what the tendency of those pas-

sages is, and whether they have that tendency which I have described to you as necessary to be found in order to bring it within this statute. The statute is an important statute; it is a statute to be enforced in all proper cases; it is not a statute to be strained; it is not a statute for twelve men to refine upon. The question which I have stated to you calls for good judgment—one to be submitted to the intelligent judgment of twelve intelligent men, who should judge sensibly, not straining points, when they determine what the tendency of the matter in this book is. It is a criminal case, and the defendant is entitled to the benefit of a reasonable doubt. You are bound to be satisfied beyond a reasonable doubt, that the tendency of this matter is such as I have described. This must not be a fancy. By a reasonable doubt is meant a doubt arising from the want of evidence. As to what the book contains, there is no dispute; and you must be satisfied in your own minds, satisfied clearly, so that you are willing to say on your oaths that you believe, that the tendency of the matter in those marked passages is such as I have described. If you believe such to be the tendency of this matter, then you must find the book non-mailable and the prisoner guilty. If you are not satisfied beyond a reasonable doubt, that the tendency of this matter is such as I have described to you, then it is your duty to give him the benefit of that doubt and acquit him."

At the close of the charge, the defendant requested the court to charge the jury, in addition, as follows: "That the jury are the final judges of the law and fact in this case, and that the definitions charged by the court are not conclusive upon them. That the court should make no absolute test or definition of the words of the statute, and that the test and definitions made and submitted to the jury by the court are advisory, and not authoritative or conclusive upon them."

The defendant also objected to the definitions given, and excepted to each of them in detail, and also excepted to each and every part of the charge, rulings and directions of the court contrary to or inconsistent with the foregoing requests, and to the refusal of the court to charge the same.

It is contended, that the court erred in what it said to the jury as to the test of obscenity within the meaning of the statute; that it substituted the stated test for the words of the statute; that the stated test was, as a definition, erroneous, and was not a definition of obscenity; that it was a definition of an effect and not of the word "obscenity;" that, because an essay tends to deprave and corrupt the morals of society, it does not follow that it is obscene; that, while all obscenity tends to immorality, all immorality is not obscenity; and that essays on the drama, gluttony, inebriety, gaming, cock fighting, horse racing, polygamy, divorce or blasphemy, advocating or palliating any of them might tend "to deprave and corrupt the morals of those whose minds are open to such influences and into whose hands a publication of this sort may fall," but they would not necessarily be obscene. It is a mistake to suppose, that, in what the court said as to the test of obscenity, it intended to give to the jury a definition of "obscenity." The dictionary says, that "obscene" means, "offensive to chastity and decency; expressing or presenting to the mind or view something which delicacy, purity and decency forbid to be exposed." The statute and the indictment both use the word "obscene" without affixing to it any definition. In the first request to charge made before the charge was given, the defendant requested the court to charge that the word "obscene" and the word "indecent" mean severally what is set forth in such request. The court refused so to charge except as such request agreed with its charge. There is nothing in the charge which is contrary to the substance of such request. On the contrary, after using, in the course of the charge, the words "obscene," "lewd," "lascivious" and "indecent," as being words whose meaning the jurors, as intelligent men, fully understood, and as being words needing, therefore, no definition to be given of them by the court to the jury, the court defines the word "lewd," as used in the statute, (it being also used in the first count of the indictment,) as meaning "having a tendency to excite lustful thoughts." The court did not define the word "lustful" any more than the first request to charge defined the word "lust," or the words "sense of decency." The court then defined the word "indecent," as used in the statute, (it being also used in the second count of the indictment,) as meaning "tending to obscenity"—"having that form of indecency which is calculated to promote the general corruption of morals." This does not mean any other form of indecency calculated to promote the general corruption of morals, than the obscene form; because, the court immediately proceeds to say, that, in what it had said about corrupting morals, it had been speaking of corrupting the morals and depraving the minds of those "open to such influences," that is, the influences of "obscene" matter, and that it meant thereby matter which would "suggest impure and libidinous thoughts in the young and inexperienced." It did not define the word "impure" or the word "libidinous" any more than the first request to charge defined the word "lust" or the words "sense of decency."

In saying that the "test of obscenity, within the meaning of the statute," is, as to "whether the tendency of the matter is to deprave and corrupt the morals of those whose minds are open to such influences, and into whose hands a publication of this sort may fall," the court substantially said, that the matter must be regarded as obscene, if it

would have a tendency to suggest impure and libidinous thoughts in the minds of those open to the influence of such thoughts, and thus deprave and corrupt their morals, if they should read such matter. It was not an erroneous statement of the test of obscenity, nor did the court give an erroneous definition of obscenity, or a definition different from that of the first request to charge. It gave a definition substantially agreeing with that of such request.

In Reg. v. Hicklin, L. R. 3 Q. B. 360, the question arose as to what was an "obscene" book, within a statute authorizing the destruction of obscene books. The book in question was, to a considerable extent, an obscene publication, and, by reason of the obscene matter in it, was calculated to produce a pernicious effect, in depraving and debauching the minds of the persons into whose hands it might come. It was contended, however, that, although such was the tendency of the book upon the public mind, yet, as the immediate intention of the person selling it was not so to affect the public mind, but to expose certain alleged practices and errors of a religious system, the book was not obscene. As to this point, Cockburn, C. J., said: "I think, that, if there be an infraction of the law, the intention to break the law must be inferred, and the criminal character of the publication is not affected or qualified by there being some ulterior object in view, (which is the immediate and primary object of the parties,) of a different and an honest character. It is quite clear, that the publishing an obscene book is an offence against the law of the land. It is perfectly true, as has been pointed out by Mr. Kydd, that there are a great many publications of high repute in the literary productions of the country, the tendency of which is immodest, and, if you please, immoral, and, possibly, there might have been subject-matter for indictment in many of the works which have been referred to. But it is not to be said, because there are in many standard and established works objectionable passages, that, therefore, the law is not as alleged on the part of this prosecution, namely, that obscene works are the subject-matter of indictment; and I think the test of obscenity is this, whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall. Now, with regard to this work, it is quite certain that it would suggest to the minds of the young of either sex, or even to persons of more advanced years, thoughts of a most impure and libidinous character." These views seem to us very sound. In the present case, the remarks made by the court, in its charge, as to the test of obscenity, were made in reference to suggestions like those made in the Hicklin Case. It was contended, that the motive and object of the book were material.

On this question the court said: "The question is, whether this man mailed an obscene book; not why he mailed it. His motive may have been ever so pure; if the book he mailed was obscene, he is guilty. You see, then, that all you are called upon to determine in this case is, whether the marked passages in this book are obscene, lewd, or of an indecent character. Now, I give you the test by which you are to determine this question. It is a test which has been often applied, has passed the examination of many courts, and I repeat it here, as the test to be used by you. You will apply this test to these marked passages, and, if, judged by this test, you find any of them to be obscene or of an indecent character, it will be your duty to find the prisoner guilty. If you do not find them, judged by this test, to be obscene or of an indecent character, it will be your duty to acquit him. This is the test of obscenity, within the meaning of the statute: It is whether, &c." The test there stated is substantially the same as that stated by Cockburn, C. J. The words "charged as obscenity," and the word "immoral" used by Cockburn, C. J., are dropped, and the words "the morals of," are not used by Cockburn, C. J. But the meaning of the two sentences is identical. The case of Reg. v. Hicklin, was approved in Steele v. Brannan, L. R. 7 C. P. 261, where Bovill, C. J., states that he fully concurs in the decision in Reg. v. Hicklin.

In the case against Heywood, before referred to, the defendant was the writer of the book, and the book was the same book which is in question in the present case. In the trial of the Heywood Case, Judge Clark, in charging the jury said: "A book is obscene which is offensive to decency. A book, to be obscene, need not be obscene throughout the whole of its contents, but, if the book is obscene, lewd, or lascivious or indecent in whole or in part, it is an obscene book, within the meaning of the law, a lewd and lascivious and indecent book. A book is said to be obscene which is offensive to decency or chastity, which is immodest, which is indelicate, impure, causing lewd thoughts of an immoral tendency. A book is said to be lewd which is incited by lust, or incites lustful thoughts, leading to irregular indulgence of animal desires, lustful, lecherous, libidinous. A book is lascivious which is lustful, which excites or promotes impure sexual desires. A book is indecent which is unbecoming, immodest, unfit to be seen. A book which is obscene, as I have said to you before, or lewd, or lascivious, or indecent, in whole or in part, or in its general scope or tendency, in its plates or pictures, or in its reading matter, falls within the scope of the prohibition of the statute. * * * An argument has been made here to show you that Mr. Heywood was a moral man, a well-behaved man, and that his design in publishing this work was a good one, that he really believed the doctrines which he taught. But the court say to you,

that, such an argument cannot be received and considered by you, and cannot make any difference in the question of guilt or innocence. A man might believe that obscene things may be and ought to be corrected, and he might argue against them and publish for this purpose; but still the book might not be allowed to go through the mails, if obscene in itself. It is not the design. There is no reference in the statute to the design that a man has in putting the book in the mail, whether for a bad or a good purpose; but the law says, explicitly, that such books shall not go through the mails, and that, if anybody deposits them, he is to be punished for it. There. is no question here in regard to the suppression or the spread of knowledge. * * * Something was said in regard to other books—that these books are no more offensive than some other books, but you are not sent here to try other books, nor to compare this book with other books, and, you heard the court rule out all other books. The sole question is, whether these books are obscene, lewd, or indecent. Other books may be so, or may not be so. They may or may not have gone in the mail. * * * Observations were made in regard to the extent to which these books might be obscene, lewd, lascivious or impure, or might excite unlawful or impure desires; and it was said to you, that you might .read these books, and they would excite no impure desire in you, no impure thought; but that is not a sure criterion, by any means. These books are not sent ordinarily to such people as you. But you may consider whether they are obscene, or lewd. or lascivious to any considerable portion of the community, or whether they excite impure desires in the minds of the boys and girls or other persons who are susceptible to such impure thoughts and desires. If any other standard were adopted, probably no book would be obscene, because there would be some men and women so pure, perhaps, that it would not excite an impure thought; but it is to be governed by its effect upon the community—whether it is obscene and is of dangerous tendency in the community generally, or any considerable portion of the community." These views are, in substance, those contained in the charge in the present case.

We are of opinion that there was no error in what was charged by the court as to the test of obscenity. No other part of the charge was specifically complained of in the argument; but it was urged that the court erred in refusing to charge as requested in the second paragraph of the first request, and in requests 2, 3, 4, 5, 6, 7, 8 and 9.

As to the second paragraph of the first request, we are of opinion that the object of the use of the obscene or indecent words is not a subject for consideration. In addition to the observations already cited from the case of Reg. v. Hicklin. Cockburn. C. J., says, further: "May you commit an offence against

the law in order that thereby you may effect some ulterior object, which you have in view, which may be an honest or even a laudable one? My answer is, emphatically, no. The law says, you shall not publish an obscene work. An obscene work is here published, and a work the obscenity of which is so clear and 'decided, that it is impossible to suppose that the man who published it must not have known and seen . that the effect upon the minds of many of those into whose hands it would come, would be of a mischievous and demoralizing character. Is he justified in doing that which clearly would be wrong, legally as well as morally, because he thinks that some greater good would be accomplished? * * .* 'I hold, that, where a man publishes a work manifestly obscene, he must be taken to have had the intention which is implied from that act; and that, as soon as you have an illegal act thus established, quoad the intention and quoad the act, it does not lie in the mouth of the man who does it to say: 'Well, I was breaking the law, but I was breaking it for some wholesome and salutary purpose.'" In Steele v. Brannan, supra, it was contended that the book treated of a matter which might properly be the subject of discussion and controversy,' and that the object of those who put it forward was not only innocent but praiseworthy, inasmuch as they intended thereby to advance the interests of religion and of the public, and that therefore, the book was not obscene. The court held otherwise, and approved the ruling in the Hicklin Case. The views of Judge Clark, to the same effect, have been quoted.

As to request 2, it was charged in substance, so far as its propositions are correct. The rest of it falls within what has been said as to the last paragraph of the first request. This last observation applies also to request 3.

As to request 4. its substance was charged. and, as to anything in it not charged, there was no error .in not charging it.

The observations made as to the last paragraph of the first request apply, also, to requests 5, 6 and 7. and the first paragraph of request 8.

The last paragraph of request 8 was, in substance, charged.

We perceive no error in the refusal to charge as requested in request 9. This statute differs from no other criminal statute, and the jury were properly instructed on the subject of a reasonable doubt.

We have. given no attention to any exceptions ‘appearing in the case, which are not presented in the printed brief of the counsel for the defendant.

The case contains the following statement: "During the absence of the jury, the court sent to them by the officer in charge, and, in the absence of the prisoner, after exhibiting the same to the counsel for the prisoner, a direction in writing. that they might deliver a sealed verdict to said officer, and that there-

upon they should be allowed to separate and directed to appear in court at the hour of the opening of the court on the next day. At about 6.30 o'clock the next morning, (March 21st, 1879,) the jury delivered a sealed verdict to the officer, and were thereupon allowed by him to separate. The court resumed its session at 11 o'clock a. m. of that day, and the jury, having been called by the clerk, announced, by their foreman, that they had agreed upon a verdict, and that he had handed a sealed verdict to the officer in charge of them. The counsel for the prisoner duly excepted to the direction of the court that the jury should bring in a sealed verdict at all, and to the reception by the court of such a verdict from the officer, and also to the right of the jury to separate at all until they had rendered their verdict in open court. Under these exceptions the jury were allowed to render a verdict of guilty, as stated in the sealed verdict received by the court from the officer, in the presence of the defendant, and which was thereupon announced and recorded in open court, as a verdict of guilty. The counsel for the prisoner then and there requested that the jury be polled, which was done, and thereupon each of the jurymen, to the question of the clerk, whether the verdict announced was his verdict, answered in the affirmative." It is contended for the defendant, that the direction of the court to the jury, in the absence of the prisoner, and without his consent, that they might deliver a sealed verdict to the officer in charge and then separate, and their doing so, is ground for a new trial. The propositions urged to this end are, that sealed verdicts have no authority in law without the prisoner's consent; that they have been introduced with great reluctance and great suspicion in civil cases, and are always a source of danger; that the separation of juries in criminal cases, after the charge of the court, is always a recognized source of danger to the prisoner, to which the law does not voluntarily expose him; that the prisoner cannot prove a negative, to show that he has not been injured; that the direction of the court is no justification or protection; that an instruction to the jury, that, after a long confinement, they may obtain a much desired release by a sealed verdict, is a direct inducement to the minority of the jury to yield against the prisoner, and was effective against him in this case; that the absence of authority for the course pursued upon this trial, and the reluctance with which any separation, before or after the charge, is allowed, is conclusive for the prisoner, on this point; and that, while the rule has been somewhat relaxed from necessity only, this has never been done so as to allow of a sealed verdict and a general separation of the jury, without the prisoner's presence, knowledge and consent, before their real verdict should be rendered in court and in the prisoner's presence.

It appears, by the case, that the direction in writing to the jury, that they might deliver a sealed verdict to the officer and might then separate, was exhibited to the counsel for the prisoner before it was sent to the jury by the court; that the jury strictly followed such direction; that the court received the sealed verdict from the officer the next morning, in the presence of the jury and of the defendant, in open court, after the jury had then and there announced that they had agreed upon a verdict and that such sealed verdict contained it; that the verdict of guilty announced and recorded was the verdict contained in such sealed verdict; and that, on the polling of the jury, at the request of the counsel for the defendant, each juror stated that the verdict announced was his verdict.

It is laid down in Whart. Cr. Law (6th Ed.) § 3125, that, "in misdemeanors, there is no difficulty, in practice, in permitting the jury to separate during the trial." In the present case, the statute expressly declares the offence to be a misdemeanor. Wharton cites the leading case of Rex v. Woolf, 1 Chit. 401, where it is held, that, in a case of misdemeanor, the dispersion of the jury does not vitiate the verdict. The dispersion referred to is one before agreement on a verdict. A fortiori, a dispersion after agreement, and after the verdict is written and signed and sealed up, and where the jury afterwards attend in court with it, and the court receives and opens it, and the jury give an oral verdict in accordance with it, on being polled, does not vitiate the trial. In People v. Douglass, 4 Cow. 26, it is laid down, that the mere separation of a jury is not a sufficient cause for setting aside a verdict either in a civil or a criminal case, if there be no farther abuse. In People v. Ransom, 7 Wend. 417, 424, it is said, that any irregularity or misconduct of the jurors will not be a sufficient ground for setting aside a verdict, either in a criminal or a civil case, where the court are satisfied that the party complaining has not, and could not have, sustained any injury from it. In Com. v. Carrington, 116 Mass. 37, the question arose, whether, in a criminal case, not capital, the jury may be authorized by the court, without the consent of the defendant, to separate after agreeing upon, signing and sealing up a paper in the form of a verdict, and afterwards return a verdict in open court, in accordance with the result so stated and sealed up. It was held, that such a course is proper. The court say: "The tendency of modern decisions has been to relax the strictness of the ancient practice which required jurors to be kept together from the time they were empanelled until they returned their verdict, or were finally discharged by the court. In civil cases the jury are never kept together at the intermissions of the sittings of the court pending the trial; and it is well settled, that, after the case is finally committed to them, they may be allowed by the court to separate, if they first agree upon and

seal up their verdict, and afterwards affirm it in open court; and that, if their verdict, when opened, does not cover all the issues on which they are to pass, the case may be recommitted to them and a verdict subsequently rendered will be good. Winslow v. Draper, 8 Pick. 170; Pritchard v. Hennessy, 1 Gray, 294; Chapman v. Coffin, 14 Gray, 454. But if, upon returning into court, one of the jurors dissents from the verdict to which all had agreed out of court, it cannot be recorded. Lawrence v. Stearns, 11 Pick. 501. In capital cases, indeed, the uniform practice in this commonwealth has been to keep the jury together from the time the case is opened to them until their final discharge. But the practice is equally well settled, and in accordance with the decisions elsewhere, that, pending a trial for a misdemeanor, the jury may be permitted by the court, without the consent or knowledge of the defendant, to separate and go to their homes at night, without vitiating the verdict. Rex v. Woolf, 1 Chit. 401; s. c. nom. Rex v. Kinnear, 2 Barn. & Ald. 462; McCreary v. Com., 29 Pa. St. 323. If the jury, in a case of misdemeanor, are allowed, without the consent of the defendant, to separate after the case is finally committed to them by the court, and before the verdict is returned, the verdict cannot be recorded, unless it clearly appears that the verdict was not influenced by anything that took place during the separation. It was accordingly held, that, where the jury were allowed by the judge to disperse upon stating to the officer they had agreed on and sealed up a verdict, and, upon coming into court, rendered an oral verdict, without any sealed verdict being produced or opened, or its contents made known to the defendant or his counsel, the verdict was invalid. Com. v. Durfee, 100 Mass. 146; Com. v. Dorus, 108 Mass. 488. But, when all possibility of improper influences is excluded by conclusive evidence that the jury arrived at and reduced to writing, before their separation, the same result which they afterwards announced in open court, the verdict may be received and recorded. State v. Engle, 13 Ohio, 490; State v. Weber, 22 Mo. 321; Reins v. People, 30 Ill. 256." These views seem to us to be the clear result of the authorities, and to be founded in reason. In the present case, it clearly appears that the jury, before they separated, arrived at the same result which they afterwards orally announced in due form, when enquired of by the clerk, in open court, and therefore, that the verdict was not influenced by anything that took place during the separation.

We have examined the cases cited by the counsel for the defendant, and find in them nothing inconsistent with the foregoing views.

After a careful consideration of all the points presented, we are unanimously of opinion, that the motion for a new trial, and to set aside the verdict, and for an arrest of judgment upon the same, must be denied.