KNAUER et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit.   September 16, 1916.)

No. 4517.

1. CRIMINAL LAW ⬤⇒1186(4)—REVIEW—TECHNICAL ERROR—INDICTMENT.
    Under Rev. St. § 1025 (Comp. St. 1913, § 1691), which provides that no indictment shall be deemed insufficient by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant, an indictment is sufficient which contains a sufficient accusation of crime, and alleges facts which are sufficient in law to sustain a conviction, and which furnish the accused with such description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against future proceedings for the same offense.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3215;  Dec. Dig. ⬤⇒1186(4).]

2. CONSPIRACY ⬤⇒43(6)—CONSPIRACY TO VIOLATE LAW OF UNITED STATES—INDICTMENT.
    In an indictment for conspiracy to violate the laws of the United States, the conspiracy itself is the gist of the offense, and the law to be violated need not be set out with the particularity required if its direct violation were charged.
    [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 86, 91;  Dec. Dig. ⬤⇒43(6).]

3. MONOPOLIES ⬤⇒31—ANTI-TRUST ACT—CONSPIRACY IN RESTRAINT OF TRADE —INDICTMENT.
    An indictment for conspiracy in restraint of interstate trade or commerce, under Sherman Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (Comp. St. 1913, § 8820), need not aver that defendants were engaged in interstate commerce, nor the doing of an overt act, nor that the conspiracy was successful.
    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20;  Dec. Dig. ⬤⇒31.]

4. INDICTMENT AND INFORMATION ⬤⇒59—DESCRIPTION OF OFFENSE.
    When the definition of an offense, whether it be by common law or by statute, includes generic terms, it is not sufficient that an indictment charge the offense in the same generic terms, but it must aver the particulars.
    [Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 180, 181;  Dec. Dig. ⬤⇒59.]

5. INDICTMENT AND INFORMATION ⬤⇒125(5½)—DUPLICITY—CONSPIRACY.
    A charge in a single count of a conspiracy to violate two or more laws of the United States does not render the indictment duplicitous.
    [Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 381;  Dec. Dig. ⬤⇒125(5½);  Conspiracy, Cent. Dig. § 81.]

6. CRIMINAL LAW ⬤⇒1149—INDICTMENT AND INFORMATION ⬤⇒163—MOTION FOR BILL OF PARTICULARS—DISCRETION OF COURT.
    A motion by the defendant in a criminal case for a bill of particulars is addressed to the discretion of the court, and its action thereon is not reviewable.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3039–3043, 3058;  Dec. Dig. ⬤⇒1149;  Indictment and Information, Cent. Dig. § 525;  Dec. Dig. ⬤⇒163.]

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. MONOPOLIES ⬡⟿29—ANTI-TRUST ACT—"COMBINATION IN RESTRAINT OF TRADE."

The National Association of Master Plumbers was formed prior to 1890, and at once took measures to prevent manufacturers and dealers in plumbers' supplies from selling direct to consumers, by resolving not to patronize such manufacturers and dealers as refused to agree to such restrictions, and by adopting a system of espionage. This policy was continued after 1890, and so extended as to bind the members to restrict their purchases to manufacturers and dealers who sold only to members of the association, excluding all other customers, although they might also be master plumbers. Members were listed in a book issued and distributed by the association. *Held* that, on the enactment of the Sherman Anti-Trust Act, the association became an illegal combination in restraint of interstate trade, and that any member who thereafter joined or affiliated with it, with knowledge of its illegal purposes and methods, was guilty of a criminal offense under section 1 of the act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 19; Dec. Dig. ⬡⟿29.

For other definitions, see Words and Phrases, First and Second Series, Combination in Restraint of Trade.]

8. MONOPOLIES ⬡⟿31—ANTI-TRUST ACT—PROSECUTION FOR CONSPIRACY IN RESTRAINT OF TRADE—EVIDENCE.

On the trial of members of the association for criminal conspiracy in restraint of interstate trade, the official record of the proceedings of the association, showing the resolutions passed declaring its purposes, and the methods adopted for carrying them out, was admissible in evidence.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. ⬡⟿31.]

In Error to the District Court of the United States for the Southern District of Iowa; John C. Pollock, Judge.

Criminal prosecution by the United States against Robert Knauer and others. Judgment of conviction, and defendants bring error. Affirmed.

Louis C. Boyle, of Kansas City, Mo. (Clark McKercher and George H. Calvert, both of Washington, D. C., on the brief), for plaintiffs in error.

Claude R. Porter, U. S. Atty., of Centerville, Iowa (G. Carroll Todd, Asst. Atty. Gen., on the brief), for the United States.

Before HOOK and SMITH, Circuit Judges, and REED, District Judge.

SMITH, Circuit Judge. Thirty-six persons, members of the National Association of Master Plumbers, among them Robert Knauer, Hugh B. McCarten, John P. Cunningham, and George H. Wentz, were indicted by the District Court of the United States for the Southern District of Iowa, charged with a conspiracy in violation of section 1 of the Sherman Act which is as follows:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprison-

ment not exceeding one year, or by both said punishments, in the discretion of the court." '26 Stats. 209.

The defendants were all tried, found guilty, and Knauer, McCarten, Cunningham, and Wentz were sentenced, and sued out a writ of error in this court. It thus appears that the plaintiffs in error were defendants in the District Court, and the defendant in error was the plaintiff there, and they will be so styled here. The record contains more than 2,300 pages, and there are more than 660 pages in the printed arguments. All this has been read and carefully considered, but it is manifest that the case must be treated in this opinion in a more condensed form.

The first and second assignments of error complain of the overruling of demurrers to the indictment and the similar overruling of the motion to quash it. The indictment covers 26 pages of the printed record, and we cannot, therefore, set it out in full here. It in substance charged that from the 4th day of June, 1911, to the finding of the indictment 240 manufacturers and wholesale dealers in plumbing supplies, who are named, and the particular places where they were engaged in business are given, were engaged in interstate commerce in such plumbing supplies; that the defendants were engaged during all of said period in a conspiracy in restraint of such interstate commerce in plumbing supplies, the place of business of each of the defendants is given, and that each of them was a member of the National Association of Master Plumbers; and when he held any office therein, or in the State Association of Master Plumbers subordinate to the National Association, or in local associations so subordinate, those facts are set forth. The indictment further alleges that:

"Each of said local associations has throughout said period been affiliated: (1) With other similar associations of master plumbers in all the principal towns and cities of the United States; (2) with a certain association in each state called the State Master Plumbers' Association for that state, composed of members whose qualifications for membership have consisted in their being members in good standing of the several local associations of said state, wherever such local associations existed, and in their being willing to be subordinate to said State Associations; and (3) with still another association called the National Association of Master Plumbers of the United States, composed of all the members of all said local and state associations, and to which all said local and state associations have been subordinate. The prime object of all said local and state associations, and of said National Association of Master Plumbers of the United States, throughout said period of time, as said defendants have each well known, has been to secure to the members thereof all the business in the United States growing out of the furnishing and installing of plumbing supplies, and this to the absolute exclusion of all others engaging in or endeavoring to start or carry on such business, and thereby unlawfully to monopolize that business.

"To this end said members of said local and state associations and said National Association of Master Plumbers of the United States have, at all times during said period, concertedly conducted their business strictly upon a plan involving the purchasing of such plumbing supplies only from manufacturers and wholesale dealers who have refrained from selling or furnishing such plumbing supplies to master plumbers and retail dealers not members of such associations, and refusing to deal with manufacturers and wholesale dealers who have made or endeavored to make sales to master plumbers and retail dealers not members of said association; and as a part of, and for in-

suring adherence to and the success of, said plan of business, said members and associations have established and maintained a system of espionage over the business of said manufacturers and wholesale dealers and that of all persons and concerns not members of such associations; have systematically gathered and disseminated among themselves information touching acts of such manufacturers and wholesale dealers in the carrying on of their said business which were not in accord with said prime object of said associations, and particularly touching sales of such plumbing supplies to persons and concerns not members of any of said associations; in many instances have taken upon themselves to notify such manufacturers and wholesale dealers of their said 'unethical' acts in a way to imply a threat of refusal to deal with, that is to say, a boycott, and have often in fact boycotted, the manufacturers and dealers so offending; and have busied themselves in the procuring of the passage of local laws and ordinances pertaining to the licensing of plumbers and the installing of plumbing, and in the administering of such local laws and ordinances in such manner as wrongfully to favor such associations and their members as against persons not members of such associations; and those things have been done, notwithstanding the proportion of the business so carried on by said members of said associations has very greatly exceeded the proportion carried on by others, whereby said members of said associations have been in a position where, by such concerted action, they could, as they have well known, bring financial ruin to manufacturers and wholesale dealers failing to conduct their business in accord with said prime object of said associations—all to the great humiliation of said manufacturers, wholesale dealers, and others who were not members of said association, and the serious and inexcusable oppression of many worthy persons less prosperous than themselves who have been ambitious to engage in, but who have been by said conspiracy prevented from engaging in, the business of master plumbers in competition with said members of said association, as well as to the great detriment of the general public, and to the scandal and disgrace of their own profession.

"So far as the purchasing of said plumbing supplies from manufacturers thereof and wholesale dealers therein has been concerned, each of said defendants, throughout said period of time, has, in every way in his power, and in ruthless disregard of the rights of others, conducted his business upon the unlawful and oppressive plan aforesaid, well knowing the character and effect thereof, and intending to accomplish said prime object of said associations, and so have put an undue, unwarranted, and unreasonable restraint upon the interstate trade and commerce in this indictment above described, particularly in said Central division of said Southern district of Iowa, and have prescribed and enforced a rule for governing, and one which has in fact governed, said trade and commerce, and unlawfully have engaged, as aforesaid, in a conspiracy in restraint of trade and commerce among the several states contrary to said act of Congress and against the peace and dignity of the United States."

The defendants, apparently without withdrawing the plea of not guilty theretofore entered, filed on October 29, 1914, a general demurrer to the indictment, and on November 23, 1914, filed a general and special demurrer, which we assume was a substitute for the original demurrer. It was elaborate, but in substance was upon the grounds: First, that the indictment did not state facts sufficient to constitute a crime against the United States; second, that it is duplicitous; third, the specific purposes and acts charged as constituting a conspiracy are not charged against the defendants; fourth, that the indictment is insufficient, vague, uncertain, indefinite, and informal. The ways in which the indictment is deemed insufficient, vague, uncertain, indefinite, and informal are then set forth in detail, and would cover five pages of this opinion. The defendants also filed a motion to quash the indictment substantially upon the same alleged grounds.

These demurrers and the motion to quash were overruled by the court.

[1] It is provided by section 1025 of the Revised Statutes that:

"No indictment found and presented by a grand jury in any District or Circuit or other court of the United States shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant."

The question in its last analysis is: Does the indictment contain a sufficient accusation of crime, and do its averments furnish the accused with such a description of the charge against them, as will enable them to make their defense and avail themselves of their conviction or acquittal for protection against future proceedings for the same offense? And it has been held that the indictment must be sufficient to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to sustain a conviction if one should be had. United States v. Cruikshank, 92 U. S. 542, 558, 23 L. Ed. 588; Dunbar v. United States, 156 U. S. 185, 191, 15 Sup. Ct. 325, 39 L. Ed. 390; Rosen v. United States, 161 U. S. 29, 34, 16 Sup. Ct. 434, 480, 40 L. Ed. 606; New York Central Railroad v. United States, 212 U. S. 481, 497, 29 Sup. Ct. 304, 53 L. Ed. 613; United States v. Bennett, 16 Blatchf. 338, 24 Fed. Cas. 1093, 1097; Hume v. United States, 55 C. C. A. 407, 118 Fed. 689, 696.

[2] In all charges of conspiracy, the conspiracy itself is the gist of the offense, and where a conspiracy is charged to violate the laws of the United States, if the conspiracy be specifically alleged, it is not necessary to allege the details of the law of the United States to be violated with the accuracy it would be if the charge were directly of the violation of the law of the United States, and not of the conspiracy to violate it. Williamson v. United States, 207 U. S. 425, 446, 28 Sup. Ct. 163, 52 L. Ed. 278.

[3] The act in question does not require that the defendants should have been engaged in interstate commerce. If they were all engaged exclusively in intrastate commerce, and they formed a conspiracy to restrain the trade of the manufacturers and wholesalers who were engaged in interstate commerce, that would make them guilty. Loewe v. Lawlor, 208 U. S. 274, 301, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Nash v. United States, 229 U. S. 373, 379, 33 Sup. Ct. 780, 57 L. Ed. 1232; Patterson v. United States, 138 C. C. A. 123, 222 Fed. 599, 618. This is substantially what is charged here. It is not necessary to their guilt that the conspiracy should be successful. Under the ancient law of conspiracy, no overt act was at all necessary to make out the guilt of the defendant.

On March 2, 1867, Congress passed a law (section 30, c. 169, 14 Stat. 471, 484), which is substantially re-enacted in section 5440 of the Revised Statutes and section 37 of the Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [Comp. St. 1913, § 10201]). In its last revision this reads:

"Sec. 37. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner

or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

The defendants are not charged under that section, but under section 1 of 26 Stat. 209. The act in question does not contain the clause that if "one or more of such parties do any act to effect the object of the conspiracy," nor any similar words. Under these circumstances an overt act by any of the defendants was unnecessary under this section of the Sherman Law. Nash v. United States, 229 U. S. 373, 378, 33 Sup. Ct. 780, 57 L. Ed. 1232; Brown v. Elliott, 225 U. S. 392, 32 Sup. Ct. 812, 56 L. Ed. 1136; Hyde v. United States, 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614.

But the further consideration of that question is not essential here, as there are a number of acts done by one or more of the parties to effect the object of the alleged conspiracy.

[4] It is an elementary principle of criminal pleading that when the definition of an offense, whether it be by common law or by statute, includes generic terms, it is not sufficient that the indictment charge the offense in the same generic terms as in the definition, but it must state the species—it must descend to particulars. United States v. Cruikshank, 92 U. S. 542, 558, 23 L. Ed. 588; United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516.

[5] It is claimed that the indictment is duplicitous, in that it charges a conspiracy to violate more than one section of the Sherman Law in a single count. "The court will never be keen to hold an indictment bad for duplicity." 5 Ruling Case Law, 1081. Without intimating that we think such a thing possible under the Sherman Law as an indictment being duplicitous because it charges in one count a violation of two or more sections of the act, we are satisfied that a charge in a single count of a conspiracy to violate two or more laws of the United States is not duplicitous. Joplin Mercantile Co. v. United States, 131 C. C. A. 160, 213 Fed. 926, 929, Ann. Cas. 1916C, 470; John Gund Brewing Co. v. United States, 124 C. C. A. 268, 206 Fed. 386. Without more, we are of the opinion that the demurrers and motion to quash were all properly overruled.

[6] The indictment was returned June 4, 1914. On July 7, 1914, the defendants were all arraigned and pleaded not guilty. By agreement of parties the case was then set for trial on December 8, 1914. At that time the case was upon application of defendants continued until February 8, 1915. On February 9, 1915, the case not having been reached because the trial judge had not reached Des Moines, the defendants filed a motion for a bill of particulars. This was supported and resisted by affidavits. This motion was submitted upon the arrival of the judge on February 10th. It was overruled, "both as to its merits and for the further reason that the same was filed without leave, and after this case had been twice peremptorily set for trial, and the defendants had demurred to and pleaded not guilty to the indictment herein." This application was addressed to the discretion of the trial court, and its action thereon is not subject to review. Dunlop v. United States, 165

U. S. 486, 491, 17 Sup. Ct. 375, 41 L. Ed. 799. See Rinker v. United States, 81 C. C. A. 379, 151 Fed. 755, 759; Morris v. United States, 88 C. C. A. 532, 161 Fed. 672, 681. Nothing need be added on this subject. The matter was discretionary with the trial court, and not only is no abuse of the discretion shown, but the long delay in filing the motion until the case was substantially reached a second time for trial fully justified the action of the trial court.

[7] The sixth assignment of error is to the overruling of a request for instructed verdict at the conclusion of all the evidence, and the seventh assignment is that there is no competent evidence to sustain the verdict. In Eastern States Lumber Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788, it appeared that there was a combination of retail lumber dealers to distribute to the members of the association names of wholesale lumber dealers who made prices to consumers. The court said:

"A retail dealer has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly in trying to undermine his trade. 'But,' as was said by Mr. Justice Lurton, speaking for the court in Grenada Lumber Co. v. Mississippi, 217 U. S. 433, 440 [30 Sup. Ct. 535, 54 L. Ed. 826], 'when the plaintiffs in error combine and agree that no one of them will trade with any producer or wholesaler who shall sell to a consumer within the trade range of any of them, quite another case is presented. An act harmless when done by one may become a public wrong when done by many acting in concert, for it then takes on the form of a conspiracy, and may be prohibited or punished, if the result be hurtful to the public or to the individual against whom the concerted action is directed.' When the retailer goes beyond his personal right, and, conspiring and combining with others of like purpose, seeks to obstruct the free course of interstate trade and commerce and to unduly suppress competition by placing obnoxious wholesale dealers under the coercive influence of a condemnatory report circulated among others, actual or possible customers of the offenders, he exceeds his lawful rights, and such action brings him and those acting with him within the condemnation of the act of Congress, and the District Court was right in so holding."

The defendants contend that the National Association of Master Plumbers was organized for legitimate purposes, and that if it deviated from such purposes and engaged in an illegal enterprise as charged there is no evidence that the defendants and particularly Cunningham and Wentz ever joined in the proceedings to convert this organization from its legitimate purposes to the illegal ones charged. Very considerable reliance in this regard is placed upon Ryan v. United States, 132 C. C. A. 257, 216 Fed. 13. This makes it important to ascertain from the evidence whether the National Association of Master Plumbers immediately after the passage of the Sherman Law was a legal organization which was diverted to an illegal purpose, or whether it was illegal from the passage of the act of 1890. The official proceedings of the National Association of Master Plumbers were introduced in evidence, and it appears therefrom that:

"For some time prior to the close of 1882, the Master Plumbers' Association of New York had been deeply impressed with a conviction of the necessity of taking some concerted action looking towards protection against the injury resulting to the trade through the facilities to purchase, at and below trade price, afforded to the outside public by manufacturers and dealers in plumbing materials.

"A full attendance of the association was held on December 1st, which subsequently resolved itself into a committee of the whole. The subject of 'protection to the trade' was made the order of the day (General Locke being called to the chair), and was carefully discussed; the result being that a committee of ten was appointed to devise such measures as would be best calculated to secure the needed protection.

"This committee, at a subsequent meeting, was discharged, owing to the want of such discretionary power as would enable it to act efficiently. A new committee of twenty-one, afterwards enlarged to twenty-five, was then created in its place, with Mr. T. J. Byrne as chairman, having a fuller scope of action for the performance of the duties entrusted to it. This committee met on the 10th of January [1883], at the Astor House, New York City, and organized by electing officers and appointing several subcommittees, and issued an invitation to the Association of Master Plumbers of Brooklyn to unite with them, which was heartily responded to. The committee immediately realized that to insure success it would be necessary to seek the co-operation of the trade throughout the country generally, and accordingly the following circular, issued by the joint protection committees of the New York and Brooklyn Associations, was prepared by the secretary and sent broadcast all over the United States.

" 'Association of Master Plumbers of the City of New York.
" '11 West 24th Street.
" 'Geo. D. Scott, President.    F. Reynolds, Secretary.
" 'New York, January 25, 1883.
" 'To the Master Plumbers of the United States—Gentlemen:

" 'The necessity of adequate protection against influences having an injurious bearing on our business has at last aroused considerable attention and created widespread discussion among the trade; and, as a result, the Association of Master Plumbers of the City of New York, together with that of the City of Brooklyn, have decided to take prompt and vigorous measures with a view to the termination of so deplorable and unsatisfactory a condition of affairs.

" 'The associations, therefore, of the two cities, through their respective presidents, have appointed two committees to work in concert—the New York one consisting of twenty-five and the Brooklyn one of eleven members—for the purpose of devising and considering the most efficient means for the better protection of our interests and also the immediate adoption of such plans as may best conduce to that end.

" 'It would scarcely be flattering to their intelligence to remind master plumbers of the obvious abuses which have crept into their business, or the many disadvantages under which it labors from various causes. Yet the best method of grappling with and suppressing evils so manifold and deep-lying must be matter of serious and deep consideration to those directly concerned.

" 'Realizing, then, that the time for action has arrived we are instructed to communicate with you confidentially to enlist your approval and co-operation.' "

It appears that:

"The responses to this appeal were of so encouraging a character as to warrant the committee in taking active measures to ensure the formation of master plumbers associations in the principal cities and towns throughout the different states, with a view to paving the way for holding a national convention of the craft in the near future, and the ultimate formation of a national association, sufficiently strong in numbers and united in sentiment, to command proper consideration from manufacturers and dealers."

Subsequently it appears the following was issued:

" 'To the Master Plumbers of the United States:
" 'Committee Rooms of the Association of Master Plumbers of the Cities of New York and Brooklyn.
" 'February 26, 1883.
" 'Gentlemen: The address lately issued to the Master Plumbers of the United States by the committee on protection of the New York and Brooklyn

Associations, for the purpose of eliciting an expression of the feelings of those interested in the questions to which it referred, has met with a response so cordial, so unanimous, and so far exceeding our most sanguine hopes, as to warrant them in laying before you a few practical suggestions as to the mode whereby our rights may be best protected. * * * And now on this all important question of protection of our trade interests, which is really the pivot of the position we are striving for as an organization, it was necessarily alluded to only in guarded terms in our late circular; nevertheless it evoked so universal and heartfelt approval that we are more than confirmed in the belief that this question can only be satisfactorily solved by a general convention of the trade.' "

Under these circulars the first meeting of the National Association of Master Plumbers took place. On taking the chair Mr. Mead addressed the assembled delegates.

"Mr. Wade: I desire, Mr. Chairman, to amend the address by striking out the word 'protection' and substitute the words 'trade interests.' * * * I simply wanted to say, Mr. Chairman, that we in Chicago have made up our minds to change the word 'protection' as it occurs there to the words 'trade interests,' thus giving a broader field to work upon. And we think that the change would be for the interests of all of us, of all plumbers throughout the United States. * * * I am probably as radical as any man in this convention in favor of protection. I have worked hard and faithfully for it. I have correspondence here with me to show that we have carried our point in Chicago. We have established a careful policy, and that policy we will always use. We have brought our men to their knees. Now, we don't desire that our enemies should know what we are going to do here in this convention, and if we use the word 'protection' they will know just what we are about; but if we should use the words 'trade interests' they won't know exactly what it means. I believe in fighting our enemies without gloves. Let us establish our policy, and then let them come to us, instead of our going to them."

The question was subsequently put on the amendment to strike out the word "protection" and insert the words "trade interests," and lost. Subsequently at the same meeting, on motion of Mr. Boyd, a committee of 10 was appointed to formulate a plan for protection between the dealers and master plumbers throughout the United States. At a later hour it was said:

"It must be thoroughly a national association spreading from the Atlantic to the Pacific and from the north to the south. Gentlemen, the question of protection directly falls to the ground and is done when you have a national association that is broad enough so that we can send forth an edict to any firm of materialmen in any city, in any state, and that edict goes forth that you shall protect in the different cities every one that sends an honest complaint, until you shall be able to say to any dealer: 'Until you protect the men in the plumbing business in your city by preserving the proper discount, we shall not buy one jot or tittle of your materials."

The next year, in 1884, the National Association met at Baltimore, and they adopted the following resolutions:

"Whereas, the manufacturing and wholesale firms in plumbing materials persist in selling to consumers to our injury and detriment, placing us towards our customers in the light of extortionists, causing endless trouble; and

"Whereas, the system of protecting us from this wrong which draws in its wake other wrongs, is ineffective; it is absolutely necessary to perfect such a system, by united action, which will remove these evils from which we have suffered for years: Therefore, be it

"Resolved, that we withdraw our patronage from any firm manufacturing or dealing in plumbers' material selling to others than master plumbers.

"Resolved, that the manufacturers of gas fixtures selling to consumers shall not receive the patronage of any master plumber.

"Resolved, that the master plumbers shall demand of the manufacturers and wholesale dealers in plumbing materials to sell goods to none but master plumbers.

"Resolved, that this association shall keep a record of all journeymen and plumbers who place in buildings plumbing material bought by consumers of manufacturers or dealers.

"Resolved, that any manufacturing or wholesale dealers dealing in wrought iron pipe, who sell to consumers, shall not receive our patronage.

"Resolved, that a committee be appointed by this association in every state and county, for the purpose of reporting to the proper officer at its head in the state any violation of these resolutions.

"Resolved, that these measures are just and necessary to our welfare and a rigid enforcement is demanded.

"Resolved, that this convention indorse the above, and urge upon the National Association to perfect and adopt a uniform system of protection for the trade over their entire jurisdiction."

In 1885 the Association met at St. Louis. At this meeting President Young was authorized to use such measures as he deemed prudent in presenting the Baltimore resolutions properly before the manufacturers. The secretary reported that he had sent copies of the Baltimore resolutions to the manufacturers and jobbers throughout the country for their signatures, and that the responses were almost universally prompt and favorable, and the following resolution was adopted:

"Whereas, the National Association of Master Plumbers, in convention assembled at Baltimore, June 25, 1884, in view of the numerous false relations which have sprung up between the manufacturers, plumbers, and consumers, whereby confusion and injustice have been produced, after much thought and discussion, passed a resolution whereby their relative rights and duties have been more clearly defined; and,

"Whereas, the manufacturers, with but few exceptions, have adopted the resolutions as their rule of conduct: Now, therefore, in justice to ourselves and in honor toward the manufacturers, we recommend the following:

"Resolved, that it is the plain duty of this association to maintain and enforce the integrity of the Baltimore resolutions, and that all members of the craft, in self-defense, be requested to withdraw further patronage from dissenting manufacturers, and stand by those who stand by us."

At the same meeting it appears that:

"300 Baltimore resolutions sent to manufacturers and dealers in plumbers' material.

"1000 arguments and Baltimore resolutions as an address sent out by the Executive Committee.

"300 pamphlets sent to the manufacturers and dealers asking for signatures for the Baltimore resolution."

The following recommendation was unanimously adopted:

"We find that the 'Baltimore resolutions' have been a benefit to the trade throughout the country during the past year, but, believing that our cause will be more advanced by allowing local associations certain discretions in the government of their own affairs, therefore we respectfully recommend that each local association shall make the necessary arrangements for the dealers and manufacturers of their own locality, and that the national association shall protect them where such agreement has been approved by the executive committee."

237 F.—2

At the fourth meeting, which was held at Deer Park in 1886, the Baltimore resolutions were interpreted as follows:

"Resolved, that any firm manufacturing plumbing materials selling to others than master plumbers, that we withdraw our patronage from such firm.

"Resolved, that the master plumbers shall demand of the manufacturers and wholesale dealers in plumbing materials to sell goods to none but master plumbers.

"Resolved that this association keep a record of all journeymen and plumbers who place in buildings plumbing material bought by consumers of manufacturers or dealers.

"Resolved, that any manufacturing or wholesale dealers dealing in wrought-iron pipe who sell to consumers shall not receive our patronage.

"Resolved, that it is not the intention of the foregoing resolutions to prevent the interchange of patented or any other plumbing materials between manufacturers and wholesale dealers in such goods, or their sale or exchange for the export trade.

"Resolved, that no local association shall make any other agreement with manufacturers or dealers than the above.

"Resolved, that a committee be appointed by this association in every state and county, for the purpose of reporting to the proper officer at its head in the state any violation of these rules.

"Resolved, that these measures are just and necessary to our welfare, and a rigid enforcement is demanded.

"Resolved, that this convention indorse the above, and urge the National Association to perfect and adopt a uniform system of protection for the trade over their entire jurisdiction."

### President James Allison said:

"The Baltimore resolutions are our own creatures, not our masters, and the plain, common-sense course to be pursued in regard to them is—instead of wrangling over our opinions—to review our experience calmly and dispassionately, weigh the good and evil carefully, and, while we remember that the standard of power in good government is the will of the majority, we must not forget that exact justice to one is not to be secured at the cost of injustice to another."

### At this convention the executive committee reported:

"Your committee would also recommend that such localities where experience has proven that our members cannot at all times live up to the letter of the Baltimore resolutions without serious injury to themselves, that discretionary power be allowed to the local associations, provided no action of theirs shall conflict with the spirit of these resolutions, and also provided that the approval of the executive committee first be obtained thereto."

### And:

"We would also recommend that the manufacturers and dealers in plumbers' supplies who have signed the Baltimore resolutions and carried out their spirit, and are in sympathy with the honest endeavors of the plumbing fraternity in raising the standard of their trade, deserve our co-operation and support, and we recommend them to the patronage of our fellow tradesmen."

At the National Association meeting held in Chicago in 1887 the following resolution was adopted:

"Resolved, that the National Association, through its executive heads, appoint a member of this organization in every city and town in the United States under its jurisdiction for the purpose of keeping a record of all dealers or manufacturers, or master plumbers, violating any of the protective resolutions of this association, said committee to report to the chairman on protection."

In the language of the Supreme Court in Grenada Lumber Co. v. Mississippi, 217 U. S. 433, 441, 30 Sup. Ct. 535, 54 L. Ed. 826, "whether it would be an illegal restraint at common law is not now for our determination." But when the Sherman Law was passed in 1890 the National Association of Master Plumbers had been organized for the 'protection' of master plumbers against the competition of the manufacturers and wholesalers, and had pledged members not to buy of such manufacturers and dealers as sold to consumers, and this had been declared "the pivot of the position we are striving for as an organization." On the day that the Sherman Law became effective this organization became illegal under the decision of Eastern States Lumber Ass'n v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788.

It is not our purpose to in any way limit the power of the members of the association to withdraw as soon as it became manifestly an illegal association. In other words, we would not deprive any member of his locus pœnitentiæ; but in 1899, after the passage of the Sherman Law, at New Orleans the National Association of Master Plumbers adopted what is known as the "New Orleans resolution" as follows:

"That we, the master plumbers of the United States, in convention assembled, do hereby assert our rights to be protected in conducting our business as plumbers and business men, and in the future will purchase our supplies from those who sell only, to members of the national association of master plumbers and manufacturers and jobbers in accord therewith."

As there were about twice as many master plumbers outside the association as inside, though generally speaking the individuals outside had rather a smaller business than those inside, still the business of those outside was so considerable that many of the manufacturers and dealers decided to resist the attempt, which was apparently successful in cutting from the list of their customers the consumers, and now sought to extend this to two-thirds of the plumbers. This resulted in a conference in New York, at which an agreement known as the "New York agreement" was made. This agreement was perhaps more nearly like the Baltimore plan than the New Orleans plan, and was agreed to by the National Association of Master Plumbers in 1900 at Baltimore. Conflicts arising under this agreement, in 1902, at Atlantic City, what was known as the "Cleveland resolution" was adopted, as follows:

"That members of the National Association of Master Plumbers are requested to confine their purchases of plumbing goods to manufacturers and jobbers who are willing to assist in improving the condition of the plumbing business, and who sell plumbing goods in localities where there are members of the National Association of Master Plumbers only to recognized master plumbers whose names appear in the National Directory of Master Plumbers, published under the supervision of the National Association of Master Plumbers."

It thus satisfactorily appears that the National Association was called for the purpose of doing what is now a violation of law, and such purpose was "the pivot of" its position. Instead of withdraw-

ing when it became illegal, members by remaining such, and continuing without objection when the association increased the already illegal restraint, became guilty under the Sherman Law without proof of any individual participation in any overt act. The institution, if the law had been as it now is, would have been illegal from its inception, and all who joined it with knowledge of its purposes, and remained members after the Sherman Law was passed, and made no effort to withdraw, or have the association withdraw, from its illegal course, are subject to conviction for conspiracy under the law. It seems needless to say that we do not mean that any person could be punished for joining this association prior to the passage of the Sherman Law, nor do we mean that a person could be punished who did not know of the illegal lines it was pursuing subsequent to the passage of that law, nor could any one in any way be deprived of his locus pœnitentiæ; but one who was a member when the act of July 2, 1890, was passed, or who subsequently became a member, and who knew the illegal purpose of the association, and never withdrew from it or repudiated its illegal methods, is guilty under the act in question.

The case is not analogous to Ryan v. United States, 132 C. C. A. 257, 216 Fed. 13, because in that case a society was created for a wholly lawful purpose and diverted to an illegal one, while in this case the very pivot of the association was the illegal conspiracy as soon as the Sherman Law was passed. As it appears that all of the defendants were members of the National Association of Master Plumbers, there was sufficient evidence to permit a conviction of all of them, and the motion to direct a verdict was correctly overruled.

We might add that the National Plumbers' Association issued two books, one, known as the "Brown Book," which contained a list of manufacturers and wholesalers "in accord" with the Association, and the other, known as the "Red Book," which contained originally a list of members of the National Plumbers' Association and all other known master plumbers. Subsequently, having upon the advice of the Department of Justice suspended the publication of the Brown Book, the Red Book was changed so as to contain the names of members of the National Plumbers' Association and no others. It is manifest that the Brown Book was to furnish the members of the National Master Plumbers' Association the names of those who would yield to the Association on the question of sales to consumers, and later on sales to others than members, and was as long as it existed the strongest evidence of the conspiracy charged; but, no sooner was the Brown Book abolished, than the Association approached the subject from the other side, and, being no longer able to notify members who were "in accord," they by the restriction of the Red Book to the members of the Association notified those "in accord" who they could sell to. The Red Book identified the parties referred to in the Cleveland resolutions as those "whose names appear in the National Directory of Master Plumbers published under the supervision of the National Association of Master Plumbers."

The motion to direct a verdict was correctly overruled, and the

seventh assignment of error must be treated in the same manner by this court.

[8] Assignments 8 to 14 are to the admission of the testimony quoted by this court.and similar evidence. No objection was made to this evidence on the day it was offered. The importance we have assigned to this class of evidence in consideration of the sixth and seventh assignments shows its admissibility in the view of this court. There are nearly 20 other assignments of errors based on rulings on admitting evidence. Suffice it to say that most of the evidence was clearly admissible. In cases where the evidence is not manifestly admissible, it appears to be without legal prejudice, and finally the court by its charge, to which no exceptions were taken, took from the jury most of this evidence.

Without expressing any opinion as to its applicability, we may add that Revised Statutes, § 1011 (Comp. St. 1913, § 1672), contains the following:

"There shall be no reversal in the Supreme Court or in a Circuit Court upon a writ of error * * * for any error in fact."

Without more, after the most careful study of all the record, we can find no error, and the judgment of the District Court as to all the defendants who sued out the writ of error is affirmed.

HOOK, Circuit Judge. I concur in the affirmance, because of the practical construction and use by the Association of its paper constitution and resolutions. This was not sporadic or exceptional, but was so general and persistent as to disclose an unlawful purpose of the organization, of which the complaining defendants must have been cognizant.