**TRUCK DRIVERS' LOCAL NO. 421, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA v. UNITED STATES.**

**BLANKENSHIP v. SAME.**

**PFOHL v. SAME.**

**Nos. 12022–12024.**

Circuit Court of Appeals, Eighth Circuit.
May 22, 1942.

C. I. McNutt, of Des Moines, Iowa (Joseph A. Padway, of Washington, D. C., and John Connolly, Jr., George E. O'Malley, and Irvin Schlesinger, all of Des Moines, Iowa, on the brief), for appellants.

Hugh B. Cox, Sp. Asst. to Atty. Gen. (Daniel B. Britt, Sp. Asst. to Atty. Gen., Thomas H. Daly and Robert Diller, Sp. Attys., both of Washington, D. C., Thurman Arnold, Asst. Atty. Gen., and Tobias E. Diamond, U. S. Atty., of Sheldon, Iowa, on the brief), for appellee.

Before THOMAS and JOHNSEN, Circuit Judges, and REEVES, District Judge.

JOHNSEN, Circuit Judge.

A local labor union, its president, its financial secretary, and its business agent were indicted jointly with the operators of six dairy companies, for violating the Sherman Act as amended, 26 Stat. 209, 50 Stat. 693, 15 U.S.C.A. § 1, in conspiring to fix and maintain the retail selling price of milk, produced in the States of Iowa, Illinois and Wisconsin, and distributed, after being standardized, pasteurized and bottled by the dairy companies, in the "Dubuque area", consisting of the city of Dubuque, Iowa, its suburban territory, and the city of East Dubuque, Illinois. The president of the union died while the indictment was pending. All of the other defendants were tried jointly to a jury and were convicted. The conviction and sentence have become final as to the dairy operators. The union, its financial secretary, and its business agent have appealed.

The union had a membership of approximately 350 persons, consisting of milk drivers, inside dairy workers, "over-the-road" truck drivers, taxicab drivers, drivers of local coal, ice, laundry and bread trucks, warehousemen and others. It was an affiliate of the American Federation of Labor and had made union contracts with all of the dairy companies involved. It had a special "milkmen's division" of about 100 members, consisting of the milk drivers and other dairy workers, which held separate meetings from the general union, and whose actions and minutes were required to be approved by the union as a whole. The milk drivers were of two classes, though the distinction is not important here—those who made deliveries in dairy company trucks, on a regular salary basis, and those who paid the dairy companies for the bottled milk and made deliveries in their own trucks, on a fixed differential.

There was evidence that the dairy companies in 1939 had held meetings among themselves and fixed the price at which the bottled milk would be sold at retail throughout the Dubuque area. The plants of five of the dairy companies involved were located in Dubuque, Iowa, and the plant of the sixth was located in Wisconsin. The minimum prices which the dairy companies as "handlers" were required to pay the farmers or producers of milk had been established for the Dubuque area by the Secretary of Agriculture, under the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 247, 7 U.S.C.A. §

608c, but these orders did not control the retail selling prices of the handlers. At a meeting of the dairy companies held on September 15, 1939, it had been agreed to fix the retail selling price at 11 cents a quart, and this price was continued in effect by all of them until the latter part of July, 1940. On July 28, 1940, Sanitary Milk Company, which had joined with the six defendant dairy companies in the price-fixing meeting of September 15, 1939, broke away from the combination and announced, by newspaper advertisements and other public notices, that on the following day it would inaugurate a new "thrift plan" of selling, under which the consumer would pay 11 cents for the first quart of milk and 8 cents for each additional quart purchased on the same delivery. The efforts made to combat the placing and keeping of this thrift plan in operation prompted this indictment.

On the evening of the day that Sanitary announced its thrift plan to the public, the milkmen's division of the union held a special meeting at its headquarters and defendant dairy operators held a meeting at a local hotel. Both meetings were purportedly called "to discuss the thrift plan". The president of the union, who also apparently served as chairman of the milkmen's division, appointed a committee to attend the meeting of the dairy operators, for the purpose of ascertaining what they intended to do about the situation. There was evidence that the dairy operators told the milk drivers' committee that they "would go along 100% with any plan the union adopted to try and stop the thrift plan". The committee reported back to the milkmen's division that the dairy operators had agreed not to change the price of their milk and "had said that they would cooperate with the union if the union could try and stop the thrift plan".

The meeting then discussed various proposals for dealing with the thrift plan, including a general strike and a strike confined to the Sanitary Milk Company. In connection with the last proposal, the minutes show the adoption of a motion that any member taking a customer from the Sanitary drivers "until the trouble is brought to a satisfactory conclusion" and "for two weeks after a settlement is made" should be fined $100 and should not be allowed to return to work until the fine was paid. It was suggested that the Sanitary drivers should go to the plant and

advise the president of the company that they would not work unless the manager, who was responsible for the inauguration of the thrift plan, was fired and the plan was discontinued. Some of the drivers accordingly went to the Sanitary plant that same evening and declared that they had voted to strike, or would be obliged to do so, unless the thrift plan was abandoned and the previous price of milk was restored. The president and the manager of the plant protested against any attempt of the union to interfere with prices and assured the drivers that there would be no lay-offs or changes in the condition of their employment by reason of the adoption of the thrift plan. The thrift plan was placed in operation the following morning, and the drivers made no attempt to strike. As a matter of fact, no strike could properly have been called without the approval of the union as a whole.

The second evening following, the milkmen's division held another meeting, as did also the dairy operators. The milkmen's division adopted a resolution, which was regularly entered in its minutes, providing that any driver "taking a customer from the driver of another company" or taking "customers who have been buying from stores" should be fined $100. A committee was selected to handle any disputes that might arise in connection with the resolution. The chairman, who was the union president, again appointed a committee to attend the meeting of the dairy operators, for the purpose of advising them of the action which had been taken. The committee did so and reported back that "the handlers would cooperate 100 per cent". The following morning, when one of the drivers or distributors, who owned his own truck, inquired of one of the dairy operators "whether any permanent price policy had been determined", he was told: "The fine has been voted on the drivers, and I don't think there will be any disturbances or losing of customers. We had figured to bring the price down to 7 cents, but after that fine was voted, we changed our plan, and we will leave it at 11 cents. The Committee from the Union came down last night and told us the fine was voted, and that took care of everything."

The president of the union, who, as has been indicated, also acted as chairman of the milkmen's division, undertook to police the situation in order to prevent any of the Sanitary drivers from accepting customers of the other dairies. On August 7, 1940, he accused a driver named Rittenhouse of having violated the $100-fine resolution and instructed him to appear before the disputes committee which had been selected at the July 30th meeting. Rittenhouse appeared before the committee that same afternoon and explained that the dairy company had informed him at the time that the customer was a newcomer to the city. The disputes committee was advised by the business agent of the union that, in his opinion, it had no authority to impose a fine and that it ought therefore to refer the matter to the executive board of the union.

The president of the union then filed a written charge against Rittenhouse with the executive board of the union, and Rittenhouse was notified to appear for hearing on September 17, 1940. He did so and, after a hearing, the matter was purportedly taken under advisement by the executive board. The executive board never took any further action upon the charges, but Rittenhouse, of course, ceased to take on more new customers. About this time the Department of Justice began to investigate the Dubuque situation, and shortly thereafter the union "took the resolution off their records".

The principal contention of appellants here, as it was in the trial court, by attack upon the indictment and by motion for directed verdict, is in substance that the union, it officers and members could not be prosecuted under the Sherman Act for the activities involved, because of the provisions of sections 6 and 20 of the Clayton Act as amended, 38 Stat. 731 and 738, 15 U.S.C.A. § 17, 29 U.S.C.A. § 52, and the provisions of the Norris-LaGuardia Act, 47 Stat. 70–73, 29 U.S.C.A. §§ 101–115. It is unnecessary to set out here these familiar provisions of the Clayton and Norris-LaGuardia Acts. The general contention made has only recently been reexamined and again directly answered by the Supreme Court in Apex Hosiery Co. v. Leader, 1939, 310 U.S. 469, 487, 488, 60 S.Ct. 982, 988, 84 L.Ed. 1311, 128 A.L.R. 1044, where Mr. Justice Stone said: "A point strongly urged in behalf of respondents in brief and argument before us is that Congress intended to exclude labor organizations and their activities wholly from the operation of the Sherman Act. To this the short answer must be made that for the thirty-two years which have elapsed since the decision of Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13,

Ann.Cas. 815, this Court, in its efforts to determine the true meaning and application of the Sherman Act has repeatedly held that the words of the act, 'Every contract, combination * * * or conspiracy, in restraint of trade or commerce' do embrace to some extent and in some circumstances labor unions and their activities; and that during that period Congress, although often asked to do so, has passed no act purporting to exclude labor unions wholly from the operation of the Act. On the contrary Congress has repeatedly enacted laws restricting or purporting to curtail the application of the Act to labor organizations and their activities, thus recognizing that to some extent not defined they remain subject to it."

The Supreme Court has not undertaken to define the boundaries of the situations in which labor organizations may become subject to the operation of the Sherman Act, and perhaps no such limitative definition is possible or desirable. Its recent opinions have however contained some clear implicational expressions that touch the present situation. Thus, in Apex Hosiery Co. v. Leader, supra, at page 501 of 310 U.S., page 996 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044, it was pointed out: "This is not a case of a labor organization being used by combinations of those engaged in an industry as the means or instrument for suppressing competition or fixing prices. See United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403; Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804." In United States v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788, the Court, speaking through Mr. Justice Frankfurter, again implicationally declared: "So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 [of the Clayton Act] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means."

In the Brims and Local 167 cases, cited in the quotation from the Apex Hosiery

Co. case, supra, the Court, in affirming convictions under the Sherman Act against a labor and non-labor group, assumed the applicability of the Act to the labor group as part of the combination in the situations involved, but did not specifically discuss the question. In Bedford Cut Stone Co. v. Journeymen Stone Cutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791, the dissenting opinion of Mr. Justice Brandeis, concurred in by Mr. Justice Holmes, pointed out, at page 64 of 274 U.S., page 531 of 47 S.Ct., that in the Brims case, in which both he and Mr. Justice Holmes had concurred, "the purpose of the combination was not primarily to further the interests of the union carpenters. The immediate purpose was to suppress competition with the Chicago manufacturers."

From the implications of the cases which have been referred to, it seems clear that, if a labor union and its members act wholly by themselves or in conjunction with other labor groups, in the sphere and by the methods recognized in the Clayton and the Norris-LaGuardia Acts, to carry out the legitimate objects of such an organization, in improving or preserving the economic position of labor in industry and its employment relationships and conditions, they are not subject to prosecution under the Sherman Act merely because their acts may incidentally serve to affect and restrain trade or commerce;[1] but that, if they undertake to act jointly with any non-labor group, whose object is to effect an illegal restraint of trade or commerce, and, as part of a concerted plan or effort, they agree or undertake to do any act, whose purpose may reasonably be construed to be directly intended to assist such non-labor group in accomplishing its illegal purpose, even though the result may also be beneficial to the position of labor, they may become subject to the operation of the Sherman Act. Thus, labor cannot seek to accomplish its legitimate objects through the illegal means of combining or conspiring with a non-labor group to fix or maintain prices on goods moving in interstate commerce without subjecting itself to the possibility of criminal prosecution under the provisions of the Sherman Act.

---

[1] In his dissenting opinion in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 486, 41 S.Ct. 172, 183, 65 L.Ed. 349, 16 A.L.R. 196, Mr. Justice Brandeis said that the Clayton Act in effect "declared that the relations between employers of labor and workingmen were competitive relations, that organized competition was not harmful and that it justified injuries necessarily inflicted in its course."

■■ Perhaps a simple way of translating the two contrasting situations into conventional legal formula would be to say that, in the first, no intent to violate the Sherman Act can exist as a matter of law; and that, in the second, the law permits the purpose or intent of the labor group to become a question of fact. If the evidence is fairly and reasonably susceptible to the interpretation that an agreement or participative collaboration has existed for the purpose of directly assisting a non-labor group to accomplish an illegal restraint, such as fixing or maintaining prices, the facts of the situation, including the purpose or intent of the labor union and its members, will ordinarily, in a criminal prosecution under the Sherman Act, have to be submitted to a jury for its determination.

It is further argued on behalf of appellants that the restraint here involved, if any, tended to prevent evils both to the consuming public and to labor; that it was in any event not an unreasonable restraint; that "the amount of milk used in the Dubuque area which found its way into interstate commerce was so negligible that it is hardly worthy of notice"; and that "public interest was not involved unless the restraint in interstate trade was substantial in amount."

It is unnecessary to discuss here the details of these and parallel arguments made in the briefs. A sufficient answer to them is found in the direct expressions of the Supreme Court. Thus, in Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 458, 60 S.Ct. 618, 626, 84 L.Ed. 852, it was said: "Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition * * *." Again, in United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 218, 221, 60 S.Ct. 811, 842, 84 L.Ed. 1129, the Court declared that "for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense. * * * Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, low-ered, or stabilized prices they would be directly interfering with the free play of market forces. The (Sherman) Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference."

■ Where direct price-fixing or price-maintenance agreements or conspiracies are involved, "the amount of interstate or foreign trade involved is not material * * * since § 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected. * * * They are all banned because of their actual or potential threat to the central nervous system of the economy." Id., 310 U.S. at pages 225, 226, note 59, 60 S.Ct. at page 845, 84 L.Ed. 1129. The "rule of reason", applied in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 518, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, and United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, to general restraints upon competition in the production or distribution of articles moving in interstate commerce, has therefore no application, where direct price-fixing agreements or conspiracies are involved. Such agreements or conspiracies, as to any goods moving in interstate commerce, are cancers upon the national economy, and the court will not admeasure the depth of their relative penetration in the individual cases.

It would therefore be quite immaterial whether the fact was, as appellants contend, that in the present case no substantial amount of the whole of interstate commerce in the field involved was restrained; although, it may be observed in passing that the defendant dairy operators controlled approximately seventy per cent of the retail distribution of the milk which moved in interstate commerce into the Dubuque area and was sold to consumers in the interstate locality, and hence their price-fixing efforts certainly operated as an effective restraint as to the particular product in the immediate interstate locality.

■ It is contended that the trial court erred in denying appellants' motions for a bill of particulars. The indictment was sufficiently detailed to inform each of the defendants fully of the nature of the accusations against them, and the record demonstrates no prejudice from the denial of the motions. A motion for a bill of particulars in a criminal case is addressed to the sound discretion of the trial

234

court, and, in the absence of some clear demonstration of prejudice, its ruling on the motion will not be reviewed. Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545; Knauer v. United States, 8 Cir., 237 F. 8, 13, 14.

■ Error is alleged because the trial court excluded from the evidence a copy of a statement by the executive board of a milk drivers' union in Minneapolis, Minnesota, of the reasons why it regarded the thrift plan as detrimental to the public and to labor. It is argued that this statement tended to show appellants' good faith in opposing the thrift plan. If the statement was relevant evidence here, it was at most merely cumulative and corroborative of other direct testimony, and the trial court did not abuse its discretion in excluding it. United States v. General Motors Corporation, 7 Cir., 121 F.2d 376, 406.

The only other contention that requires consideration is the claim that the evidence is insufficient to support the convictions.

■ As to appellant Pfohl, who was financial secretary of the union and a milk driver for one of the defendant dairy companies, the record shows that he was present at the meeting of the milkmen's division on July 28, 1940, though he came in late; that he was the one who suggested that the Sanitary drivers should go down and tell the president of the company that "they would not work until Patsey was fired as manager and the Thrift Plan given up"; that he was present when the committee which had been sent down to call upon the dairy operators returned and made its report to the meeting; that he was also at the meeting of July 30, 1940, when the $100-fine resolution was adopted; that he apparently approved of it, except that he thought possibly it ought not to be applied to a case where a sick person wanted to change dairies in order to get a more healthful milk; that he was present at the meeting of the disputes committee, when Rittenhouse appeared to answer the charge of violating the resolution, and was one of those who suggested that, in order to be legally handled, the charges ought to be referred to the executive board of the union; and that at the subsequent meeting of the executive board he was of the view that no fine could properly be imposed until the union itself had acted upon and approved the resolution which the milkmen's division had adopted. From this evidence, the jury could properly find that Pfohl knew of the intended cooperation between the milkmen's division and the dairy operators, for the purpose of trying to maintain the 11¢ price on milk and to defeat the operation of the thrift plan; that he acquiesced and directly participated therein and that his only concern was that the proper formalities of procedure were observed to permit the union machinery to operate.

As to appellants Blankenship and the union itself, the question is somewhat closer. Blankenship, who was the recording secretary and business agent of the union, did not attend the meeting of the milkmen's division on July 28 and 29, 1940, although he later served as secretary of the disputes committee, at the time Rittenhouse appeared before it to answer charges of violating the resolution which the milkmen's division had adopted. He objected, however, to the authority of the disputes committee to impose a fine and suggested that the charges ought to be filed with the executive board of the union. He sent out notice to Rittenhouse to appear before the executive board, but, when the meeting was held, of which he acted as secretary, he suggested that he felt the executive board should take no action unless and until the union itself had approved the resolution which the milkmen's division had adopted.

■ As business agent of the union, Blankenship had also negotiated separate contracts between the union and the several dairy companies during 1938 and 1939, most of which had contained a provision that the dairy company involved would not make a change in the price of milk without first taking the matter up with a committee representing the "distributors unit" of the union. The evidence showed no relationship, however, between this contractual provision and the subsequent conspiracy here involved, and on the record it could hardly fairly be claimed to have had any other purpose at the time than to safeguard against the possibility of sudden wage changes on the part of any dairy company without the consideration or approval of the union. The dairy companies made price changes after the several union contracts were entered into, as to which the distributors unit was not shown to have been consulted, but as to which it could not complain since wages apparently were not affected thereby. These union contracts could not therefore be said to have evidenced an intent on

the part of Blankenship or the milkmen's division to become parties to a subsequent price-fixing or price-maintaining conspiracy with the dairy operators, as the Government here contends.

We are of the opinion that the evidence was insufficient to permit the jury to find that Blankenship had joined in the price-maintaining conspiracy and was attempting to further it, either individually or officially. He did not participate in the meetings of the milkmen's division, as did Pfohl. He did not make collaborative suggestions or engage in any personal furthering activity. At all times he insisted that nothing could or should be done, until the union itself had considered the matter. Without some supportive proof of personal assent, such as existed as to Pfohl, his protests could not be said to have been mere procedural concerns, as they might properly be found to be in the case of Pfohl, but could only fairly be held to have been restraining objections to the right of any one to join or participate in any action, unless and until the union had authorized it. Nor, in this situation, could there be claimed to be any official criminal responsibility upon him as business agent, unless the things done by the milkmen's division were actually, as a matter of law or fact, the actions of the union itself.

We do not believe that on the record before us a jury could be permitted to find that the actions of the milkmen's division and its members, the efforts of the president of the union and the hearings held by the disputes committee and the executive board could be imputed to the union as a matter of general agency. To bind the union in a situation such as this, actual and authorized agency was necessary; mere apparent agency would not be sufficient to take the matter to the jury, unless the circumstances were so strong as competently to support an inference of actual authority.

In United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 393–396, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762, the Supreme Court refused to allow an international union to be held liable, as a participant, for the illegal acts of a district coal mining strike, although the president on a trip to the strike vicinage had familiarized himself with the facts and had made a personal report to the international board, and the journal of the international union had thereafter published communications and editorials giving accounts of the occurrences and accusing the mine owners of being responsible for the violence which had resulted, and justifying the action of the union men. The president of the international union had further written a letter to the President of the United States, thanking him for pardoning one of the officials of the local body who had been convicted and sentenced to prison in connection with some of the strike violence.

The Court, speaking through Mr. Chief Justice Taft, declared, pages 394, 395 of 259 U.S. page 577 of 42 S.Ct., 66 L.Ed. 975, 27 A.L.R. 762: "The president [of the international union] had not authority to order or ratify a local strike. Only the Board could do this. White's [the president] report in an executive meeting of the Board of the riot of April 6 shows sympathy with its purpose and a lack of respect for law, but does not imply or prove on his part any prior initiation or indicate a desire to ratify the transaction as his work. The Board took no action on his report. * * * A corporation is responsible for the wrongs committed by its agents in the course of its business, and this principle is enforced against the contention that torts are ultra vires of the corporation. But it must be shown that it is in the business of the corporation. Surely no stricter rule can be enforced against an unincorporated organization like this. Here it is not a question of contract or of holding out an appearance of authority on which some third person acts. It is a mere question of actual agency * * *."

After a retrial in the lower court, the case again came before the Supreme Court in Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963, and the question of the sufficiency of the evidence to show participation by the international union in the illegal events of the strike was again considered and discussed, at pages 299–305 of 268 U.S., 45 S.Ct. 551. Proof of additional statements and promises made by the president of the international union had been introduced in evidence, indicating that he had directly encouraged and abetted the destruction of the mine owners' property. The Court, again speaking through Mr. Chief Justice Taft, held that while this evidence might have been sufficient to subject the president to a personal responsibility, it was not sufficient to impose a

236

liability upon the union. The opinion says, at page 304 of 268 U.S., page 554 of 45 S.Ct.: "In our previous opinion we held that a trades-union, organized as effectively as this United Mine Workers' organization was, might be held liable, and all its funds raised for the purpose of strikes might be levied upon to pay damages suffered through illegal methods in carrying them on; but certainly it must be clearly shown in order to impose such a liability on an association of 450,000 men that what was done was done by their agents in accordance with their fundamental agreement of association."

The proof of actual agency required against a union in a criminal case under the Sherman Act necessarily must be as strong or stronger than that required in a civil action under the statute for damages.

In the present case, the situation of course is somewhat different from that referred to in the Coronado Coal Co. cases, supra, in that only a local union and its divisions are involved, but, on the record before us, the difference fundamentally is primarily one of degree. The evidence shows, as we have previously indicated, that the milkmen's division was a separate unit of the general union and held independent meetings. The Government did not attempt to develop the scope of the actual relationships between the division and the union. The only thing that the evidence specifically shows in this connection is that the minutes and actions of the milkmen's division were required to be approved by the union as a whole, before they would be binding on that body. With only this proof in the record, we would not be justified in assuming, nor a jury in finding, that the milkmen's division was so integrated in the union structure that its actions would be binding on the union itself as a matter of identity or actual agency, regardless of whether they were in fact approved or sanctioned by the union body.

Nor, in view of the requirement for approval of the actions of the milkmen's division by the union itself, could the acts of the president of the union, while serving in the capacity of chairman of the milkmen's division, be given greater effect, without more specific proof of the existing relationships and actual authority, than an attempt as such chairman to further the plans of the division. On the record before us, the president must be treated as having no authority to commit the union, through the milkmen's division, to any such conspiracy as is here involved, until the union had approved or in some imputable manner sanctioned what the milkmen's division had done. The same necessarily would be true of the disputes committee and executive board. In order to impose a responsibility upon the union in the situation, as the Court said in the second Coronado Coal Co. case, supra, "certainly it must be clearly shown * * * that what was done was done by their agents in accordance with their fundamental agreement of association".

We do not mean to imply that the union had to approve the action of the milkmen's division by formal motion or resolution. Such approval might perhaps legally be found to exist from actual knowledge and general sanction on the part of the union body of the efforts of the milkmen's division to cast the strength of the union into the situation. But here again the record before us is lacking in adequate proof. The knowledge and sanction of the president and of Pfohl, acting as part of the milkmen's division, and the knowledge of Blankenship and of the executive board, with no action on the part of the latter indicative of actual approval and an attempt to put the union machinery into operation in the cause, could not be said to have committed the union to the conspiracy, in view of the specific limitation which the record uncontradictedly shows existed upon the authority of the milkmen's division to bind the union. What might have been the situation, if the officers of the union had been performing the mere normal functions of their offices for the union, or if the evidence had blurred the line of demarcation between the milkmen's division and the union body itself, we need not consider. Those were facts which, if they existed, the Government should have been in a position to prove.

The fact that the union expunged the resolution of the milkmen's division from the records certainly cannot be accepted in a criminal prosecution as establishing previous knowledge and sanction on the part of the union body, without some proof that this was not the first time that the resolution or the actions of the milkmen's division had been brought to the attention of the union. If the union body knew of the action of the milkmen's division prior to

the time it expunged the resolution from the records, this fact surely was susceptible of proof in some manner on the part of the Government. As the record stands, we must assume that this was the first time that the matter actually was brought to the attention of the union itself, the great majority of whose members consisted of men engaged in other industries.

Doubtless the evidence was sufficient as against the milkmen's division to have required the submission of its guilt to the jury, if that division had been and could be prosecuted as a body. Whether the milkmen's division was sufficiently in the nature of an association to be capable of being prosecuted as such, or whether its members could only have been prosecuted individually, does not appear in the record, nor is it material here. The fact that appellant Pfohl is the only participant in the activities of the milkmen's division upon whom the burden of conviction will fall in the present proceeding is, of course, not a valid legal argument for a reversal in his favor.

The judgment will be affirmed as to appellant Pfohl and will be reversed as to appellant Blankenship and the appellant union.